Filed 8/18/14  P. v. McGaw CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>  v.<br><br>CLIVE McGAW,<br><br>        Defendant and Appellant. | C068312<br><br>(Super. Ct. No. 10F00998) |

A jury found defendant Clive McGaw guilty of committing an act of oral copulation with a person physically or mentally incapable of giving consent, to wit, his daughter A.M., who was born with Down syndrome (Pen. Code, § 288a, subd. (g); count one)[1]; two counts of committing lewd and lascivious acts upon a dependent person, A.M., by a caretaker (§ 288, subd. (c)(2); counts two & three); and failing to register as a sex offender (§ 290.018, subd. (b); count four).  The jury also found true allegations defendant had four prior strike convictions (§ 667, subds. (b)-(i)) and that the prior

_____

[1]  Further undesignated statutory references are to the Penal Code.

convictions were for committing lewd acts pursuant to section 667.51, subdivisions (a) and (c).  The trial court sentenced defendant to an aggregate term of 140 years to life in state prison, consisting of 25 years to life on counts one and four, and consecutive terms of 45 years to life on counts two and three.

Defendant appeals, contending the trial court prejudicially erred in admitting evidence of prior uncharged sexual conduct, denying his motions to sever trial of the failure to register count (count four) from the trial of the remaining counts and to bifurcate the trial of his prior convictions, and failing to instruct the jury sua sponte that they must unanimously agree on the specific act forming the basis of the oral copulation count (count one).  Defendant also asserts that there is insufficient evidence to support the corpus delicti requirement as to the oral copulation count (count one), and that his convictions for committing lewd and lascivious acts (counts two & three) must be reversed because he is not a "caretaker" under section 288, which defines "caretaker" as "an owner, operator, administrator, employee, independent contractor, agent, or volunteer of any of the [enumerated] public or private facilities when the facilities provide care for elder or dependent persons."  (§ 288, subd. (f)(1).)

We shall reject all of defendant's contentions but one.  We shall conclude that a parent, such as defendant, who cares for a dependent child at home, is not a "caretaker" within the plain meaning of section 288 and reverse his convictions on counts two and three, thereby reducing his sentence from 140 years to life to 50 years to life.  We shall affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was married to H.M. for approximately 35 years.  They have three adult children together:  daughters J.M. and A.M. and son R.M.  A.M. was born in 1982 with Down syndrome.  At all relevant times herein, A.M. functioned at a kindergarten level, with very basic skills.

2

In 1983, defendant was convicted of molesting his eldest daughter J.M. and a neighbor T.T. In particular, he was convicted of two counts of committing lewd acts on a minor under the age of 14, J.M.; one count of committing lewd acts on a minor under the age of 14, T.T.; and one count of participating in an act of oral copulation with a minor under the age of 14, J.M. The acts occurred in 1982 while H.M. was in the hospital giving birth to A.M., and J.M. was approximately six years old. Defendant placed his penis in J.M.'s mouth and ejaculated. They also played a game wherein J.M. would walk around a coffee table while defendant sat on a nearby couch wearing only a towel, and each time she did so, she would touch defendant's penis. One time they played the game with their five-year-old neighbor T.T. Following the incidents, defendant "move[d] out" and returned home when J.M. was 13 or 14 years old. All three children still resided in the home at that time, and H.M. was concerned about defendant returning home given his convictions. Nearly every night for at least six months after defendant returned home, J.M. observed defendant outside her window attempting to watch her while she undressed.

In February 2008, defendant was living with H.M. and A.M. in Sacramento. A.M. was 25 years old. Defendant slept in his own room. H.M. and A.M. slept together in another room so that H.M. could tend to A.M.'s needs. H.M. also was worried about defendant touching A.M. H.M. tried not to leave A.M. alone with defendant because she was concerned defendant might sexually abuse her. There were times, however, that defendant was alone with A.M. such as when H.M. was late getting home from work or A.M. was late getting picked up for school. H.M. assisted A.M. with her hygiene, helping her to bathe and to wipe after using the restroom. Defendant did not assist A.M. with those things. A.M. liked to lick H.M. and defendant. H.M. did not believe there was anything sexual about the licking, it was just A.M.'s "kind of silliness." A.M. did not lick or kiss other people, and there were no reports of A.M. acting out sexually at school.

On February 20, 2008, Derika Reese, a referral coordinator at UC Davis Medical Center, observed defendant and A.M. in the cafeteria in the family practice building passionately kissing with open mouths (count two), holding hands, and giggling. She also saw A.M. grab defendant's "genital area" (count three) and defendant "playful[ly]" push her hand away and say, "[T]hose are my balls." The two were giggling and laughing at that time, and defendant appeared to enjoy it. Reese had never seen defendant or A.M. before and assumed they were a couple. Reese left the cafeteria after receiving her food.

About a week later, on February 28, 2008, Reese was working at the front desk when she saw defendant and A.M. enter. When she checked A.M. in for her appointment, she realized that defendant and A.M. were father and daughter and contacted A.M.'s doctor or a member of the doctor's staff and told that person what she had observed in the cafeteria a week earlier.

A.M. was at the medical center for her first pelvic exam. H.M. accompanied her into the exam room, while defendant waited outside. When the doctor attempted to perform the exam, A.M. refused, which is not uncommon, and before the doctor could attempt to persuade A.M. to change her mind, the doctor was interrupted by a nurse and stepped out of the room. The nurse showed the doctor information on a website indicating defendant was a registered sex offender. At that point, the doctor returned to the room to talk to H.M., and A.M. left. The doctor asked H.M. if defendant was "abusing your child," and H.M. said, "[N]o." The doctor then asked H.M. if defendant has "ever abused your child, your daughter," and H.M. responded, "[Y]es." From the doctor's perspective, it was clear that she (the doctor) was referring to A.M. The doctor asked H.M. if she felt that her daughter was safe at home, and H.M. responded, "[N]o." When asked why, H.M. said, "I am at work, and she's alone with the father." H.M. told the doctor that she wanted to move out, but she did not have the money. The doctor called adult protective services and the police.

4

Detective Paul Schindler with the Sacramento Police Department's Sexual Assault Family Enforcement Team was assigned to follow up on allegations of sexual abuse involving A.M. On March 4, 2008, he spoke to Reese at UC Davis Medical Center, who showed him the area of the cafeteria where she saw defendant and A.M. He also watched a videotape of the cafeteria taken on February 20, 2008, and saw defendant and A.M., as well as Reese, enter the cafeteria. He was unable to observe the conduct described by Reese. Reese said that the conduct occurred while defendant and A.M. were in line, and due to the camera angles, Schindler "could only see from the waist down or even lower than that of the people there."

On March 3 or 4, 2008, during the course of his investigation, Detective Schindler discovered that defendant is a registered sex offender, and that he failed to complete his sex offender registration within five days of his birthday on February 17, 2008 (count four). Defendant last registered on February 16, 2007. On April 30, 2008, Schindler went to defendant's residence. Defendant was not home, and Schindler left his business card. On May 1, 2008, defendant telephoned Schindler, and when Schindler raised the issue of defendant's registration, defendant explained that he had forgotten to register.

On May 6, 2008, defendant went to Detective Schindler's office and was placed under arrest for failing to register and transported to jail. Schindler interviewed defendant at the jail. Defendant recalled going to UC Davis Medical Center with A.M. a couple of months earlier. Schindler told defendant that a witness saw A.M. kissing defendant and grabbing his "crotch" at the hospital, and defendant responded, "Unfortunately that is one of the symptoms of Down syndrome." He explained that he is "always pushing her away," and telling her "don't do that." Defendant kissed A.M. on the "cheeks, lips, eyes, [and] nose. [¶] . . . [¶] . . . Like you do any other little kid." He kissed A.M. on the lips because she wanted him to and denied ever putting his tongue in her mouth but said that she had put her tongue in his.

5

Defendant acknowledged "hav[ing] problems" and "try[ing] to avoid them." He explained that he molested his eldest daughter when she was young, went to counseling, and "they pointed out what I need to watch for in my own reactions to what could be a very innocent come on. So I watch for that and I push her away. And I maintain a distance from her." The only problem he had with A.M. at that time was that she was coming into his room when he was changing and trying to touch him. She had managed to grab defendant's penis before he could get her hand away. Defendant denied becoming erect when she grabbed his penis and explained that "getting erect right now is . . . not a thing I do very easily with the list of meds I've got." He also stated that A.M. had rubbed her bare breasts up against him, and that he had been stimulated by that. Defendant said that he is able to maintain his composure about 99 percent of the time, and "[o]ne percent of the time . . . I'm falling out of my comfort zone and the thing I have to do is make sure [A.M.'s] gone someplace so I can lock myself in the bathroom and masturbate." Defendant denied fantasizing about A.M. but acknowledged fantasizing about her introducing him to girls from her school in the same age bracket and mental capacity. He also admitted still fantasizing about J.M.

Defendant sometimes watched pornographic films after he thought A.M. had left for school only to have her return, see the films, and ask to join in. Defendant would tell her no and turn off the film within five minutes.

Defendant explained that his "memory is pretty much shot" and that he did not "remember her doing anything. I know I haven't had sexual intercourse with her." He was unsure whether A.M. had come in and "experiment[ed] with oral." When Detective Schindler asked him whether he had ever awakened to find A.M.'s mouth around his penis, defendant responded, "I don't know if it was around it when I woke up. [¶] . . . [¶] . . . She was over it." He explained, "I had been dreaming of getting a blow job so I don't know if I woke up before, during, or after." That happened two or three times over the past ten years; the last time was a month or so prior to the interview and around the same

6

time as A.M.'s scheduled pelvic exam. When asked whether he climaxed in the dream, defendant responded, "Uh-huh. And there she was."

On May 20, 2008, with defendant's consent, Detective Schindler searched defendant's bedroom at his home and recovered 370 pornographic DVD's and 39 pornographic VHS tapes. Schindler viewed several of the DVD's, and all of those viewed were of adults.

Defendant did not testify at trial.

DISCUSSION

I

The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Defendant's Prior Uncharged Sexual Conduct

Defendant contends the trial court "abused its discretion in admitting evidence of the prior conduct involving his other daughter [J.M.] and the neighbor [T.T.]" In particular, he asserts that the trial court erred by not excluding the evidence under Evidence Code section 352, which gives the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue time consumption or create substantial danger of undue prejudice, confusing the issues, or misleading the jury.[2] We discern no abuse of discretion.

The prosecution moved in limine to admit evidence of defendant's uncharged sexual conduct to establish defendant's propensity to commit sexual offenses pursuant to Evidence Code section 1108. As relevant here, the prosecution sought to introduce evidence of defendant's prior convictions involving his daughter J.M. and neighbor T.T., and his peering into his daughter J.M.'s room after he returned home. The prosecution

_____

[2] Defendant also asserts that Evidence Code section 1108 violates the due process clause of the United States Constitution. He acknowledges this argument was rejected by our Supreme Court in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*), and that we are bound to follow that decision, but asserts the claim in order to preserve it for federal review. Defendant's federal claim is so noted, and we need not address the argument.

7

asserted that defendant's conduct toward J.M. and T.T. was "clearly relevant because the defendant's intent is at issue on the counts charged in this case. And this clearly goes towards his intent." The prosecutor also argued that the sexual assaults of J.M. and T.T. were similar to the charged offenses in that the victims' ages at the time of the earlier assaults were the same as A.M.'s mental age at the time of the charged offenses, and that "defendant's relationship [to the victims in both the prior and charged offenses] was a position of trust . . . ." The prosecution further claimed that "[w]hen compared to the allegations in the instant case, the prior conduct is not so outrageous that it would cause the jury to decide the instant case on the prior conduct alone."

Defendant objected to the introduction of such evidence as "over doing it," noting that the prosecution intended to "introduce both the conduct and the conviction[s]." According to the defendant's trial counsel, "the case is pulled along more by some of these acts that are decades and decades old as opposed to the present conduct, and that's the prejudice that's involved with the over emphasis of the old conduct and charges."

The prosecutor responded that evidence of defendant's conduct was relevant to establishing defendant's intent and that evidence of his convictions "goes towards [the prosecution's] burden of proof" because "[t]he jury doesn't have to wonder . . . whether [defendant] actually committed those offenses or participated in that conduct. They will know that he did it, so that's very relevant as well."

The trial court ruled that evidence of defendant's prior sexual conduct was admissible. The court found that "there's significant prejudicial effect," but that "the probative value far outweighs the prejudicial effect given the ambiguity of the acts alleged in this case." The court explained, "[W]e have particularly ambiguous acts charged in this current case -- oral copulation is not ambiguous, but the facts that might support an inference of oral copulation are quite thin. For that reason, the defendant's intent is more at issue in this case than in most cases. The intent cannot be as easily determined in these cases as when there's an allegation of sexual penetration."

8

Pursuant to Evidence Code section 1108, in a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is admissible to prove his conduct on a specified occasion, if the evidence is not inadmissible pursuant to Evidence Code section 352. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1161-1162.) Evidence Code section 1108 permits the trier of fact to consider evidence of defendant's prior sexual offenses " ' "as evidence of [his] disposition to commit such crimes, and for its bearing on the probability or improbability that [he] has been falsely or mistakenly accused of such an offense." ' " (*Falsetta, supra,* 21 Cal.4th at p. 912.) When assessing the admissibility of evidence of prior sex crimes under Evidence Code section 1108, the trial court engages in a careful weighing process under Evidence Code section 352. (*Falsetta,* at p. 917.) "[T]rial judges must consider such factors as [the prior sex offense's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*Ibid.*)

We review the trial court's ruling under Evidence Code section 1108 for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61 (*Loy*).) "Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion. [Citation.] '. . . [D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.' " (*People v. Cross* (2005) 127 Cal.App.4th 63, 73.)

Here, the prior and charged offenses are substantially similar. The prior offenses involved defendant committing an act of oral copulation with his daughter, J.M., and engaging in a game with J.M. and her friend T.T. that involved the girls touching

9

defendant's penis. The charged offenses include defendant committing an act of oral copulation with his daughter, A.M., and A.M. touching defendant's penis. While A.M. was substantially older than J.M. at the time of the alleged offenses, A.M.'s mental age was virtually the same as J.M. and T.T.'s physical ages. Furthermore, the facts of the prior offenses, although unpleasant, were not particularly inflammatory compared to the crimes charged in this case. Defendant contends that "[j]urors would likely view this prior substantial sexual conduct, particularly sodomy, with 4 and 5 year old children as much more inflammatory." We disagree that the jury would view defendant's sexual conduct with his six-year-old daughter and her five-year-old friend as more inflammatory than his similar conduct with his 25-year-old developmentally disabled daughter. As for the sodomy, the jury never heard about it. While the prosecution sought to introduce evidence that "defendant sexually abused [J.M.] for a three year period by having anal sex with [her]," the trial court apparently ruled such evidence was admissible, and the jury never heard it. To the contrary, J.M. testified that she did *not* recall defendant touching her vagina or her anus, and the jury was read a stipulation stating that defendant had been convicted of three counts of committing a lewd and lascivious act on a minor and one count of oral copulation of a minor. Thus, while evidence that defendant engaged in an act of sodomy with his six-year-old daughter theoretically may be more inflammatory than the charged offenses, it is of no consequence because the jury never heard any such evidence.

Defendant's conviction of the prior offenses strongly supports their admission. (*Loy, supra,* 52 Cal.4th at p. 61.) "His commission of those crimes had already been established and was thus certain, and defendant bore no new burden of defending against the charge[s]. The jury would not be tempted to convict him of the charged crime[s] to punish him for the earlier crimes. [Citation.] Additionally, the convictions meant there was little danger of confusing the issues or requiring an inefficient mini-trial to determine defendant's guilt of the previous crimes." (*Ibid.*)

10

While the 25-year gap between the prior offenses involving J.M. and T.T. and the current offenses involving A.M. is significant, "[n]o specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*People v. Branch* (2001) 91 Cal.App.4th 274, 284 (*Branch*).)  Indeed, numerous cases have upheld admission pursuant to Evidence Code section 1108 of prior sexual crimes that occurred decades before the current offenses.  (*Branch,* at p. 284 [upholding admission of a prior sex crime committed 30 years before the current crime]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 (*Pierce*) [upholding admission of a prior sex crime committed 23 years before the charged offense].)  Moreover, " '[s]ubstantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses.  [Citation.]'  [Citation.]" (*Pierce*, *supra*, 104 Cal.App.4th at p. 900, quoting *Branch*, *supra*, 91 Cal.App.4th at p. 285.)

Defendant complains that the challenged evidence bolstered an otherwise weak prosecution case.  Even assuming for argument's sake that defendant is correct, "the argument would not aid him.  The supposed weakness of the rest of the case would be relevant to the question of prejudice if there were error, but it provides no reason to exclude this particularly probative evidence." (*Loy, supra,* 52 Cal.4th at p. 64.)

Defendant also argues that the trial court's finding that "the evidence of the uncharged conduct would have a 'significant' prejudicial effect, . . . should have weighed in favor of exclusion of the evidence."  While the trial court did find that "there's significant prejudicial effect," it concluded that "the probative value far outweighs [it] . . . ."  Moreover," '[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is 'prejudicial.'  The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an

individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214, quoting *People v. Karis* (1988) 46 Cal.3d 612, 638, italics omitted.) In this case, we are confident that whatever "emotional bias" the evidence of prior conduct involving J.M. and T.T. might have tended to invoke against defendant was nugatory, given the substantially identical evidence offered regarding the crimes which were actually at issue. As previously discussed, nothing about the prior conduct made defendant look significantly worse, or made his alleged conduct in the present action appear significantly more egregious, than it already did.

Defendant disagrees, arguing that "the jury may have believed [defendant] 'got off light' as to [the prior conduct]" because they "learned [defendant] only served 6 or 7 years for the offenses, and that upon his release from prison he committed additional acts against [J.M.] which went 'unrevenged.' " The prosecution did not mention defendant's sentence in his motion in limine, much less seek to have it introduced. Nor was it discussed at trial. The jury learned only that the prior offenses occurred in 1982 when J.M. was six years old, defendant was convicted of those offenses in 1983, and returned home when J.M. was 13 or 14 years old. While the jury may have speculated as to defendant's punishment that did not warrant the exclusion of the evidence of defendant's prior sexual conduct. As detailed above, defendant's conviction weighed heavily in favor of admission. (See *Loy, supra,* 52 Cal.4th at p. 61.) Insofar as defendant told police that A.M. "did all the initiating," the evidence of the prior offenses was particularly probative. Likewise, evidence that defendant attempted to watch J.M. undress after he returned home was relevant because it showed that defendant's sexual interest in his daughter continued long after he was convicted of the prior offenses. While the prior offenses occurred approximately 25 years before the current sexual offenses, evidence of defendant's subsequent conduct showed that his sexual interest in his daughter continued years later.

12

Finally, defendant asserts the trial court should have excluded evidence J.M. testified against him when she was six or seven years old as an unnecessary, inflammatory detail. Such evidence was not part of the prosecution's motion in limine, and defendant failed to object to the introduction of such evidence at trial. Accordingly, defendant forfeited this argument on appeal. (Evid. Code, § 353; *People v. Doolin* (2009) 45 Cal.4th 390, 448.) Even assuming the issue had been preserved, we conclude that any error in admitting it was harmless. Given the admission of evidence that defendant participated in oral copulation with J.M. and encouraged and allowed J.M. and T.T. to touch his penis, we find that it is not reasonably probable that defendant would have obtained a more favorable result had the jury not learned of that J.M. testified against him when she was six or seven years old. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 924.)

## II
## Any Error in Denying Defendant's Motion to Sever the Trial of the Sex Offender Registration Count from the Trial of the Remaining Counts Was Harmless, and the Trial Court Did Not Err in Denying Defendant's Motion to Bifurcate the Prior Conviction Allegations

Defendant next contends the trial court prejudicially erred in denying his motion to sever the trial of the sex offender registration count from the remaining counts, "and on that basis, refusing to bifurcate the trial of the prior conviction allegations." The People concede "that the failure to register [offense] was not properly joined with the other offenses," but assert that reversal is not required because defendant was not prejudiced by the improper joinder. We agree that any error in denying the motion to sever was harmless because the jury would have learned of the prior sex offenses that gave rise to the obligation to register under Evidence Code section 1108. For the same reason, we conclude the trial court did not err in failing to bifurcate the trial of the prior conviction allegations.

13

Defendant moved to sever the failure to register count from the remaining counts on the grounds the failure to register count was not in the same class of crimes as the remaining counts, the type of evidence required to prove the failure to register count was different from that which would be introduced to prove the other crimes, and the crimes were "not connected in their commission." The trial court agreed that "these are not the same class of crimes" but denied the motion because the jury would hear evidence of the sexual offenses that gave rise to the registration requirement under Evidence Code section 1108, and the evidence regarding the failure to register would not be "so prejudicial as to warrant it being excluded . . . ." The court reasoned, "The thing that will inflame the jury is knowing that the defendant who is charged with child sexual molestation or dependent sexual molestation has previously engaged in that conduct. And the jury is going to be aware of that from the [Evidence Code section] 1108 evidence . . . ." As for the registration requirement, the court observed, "The additional factor on top of that that somebody has to register when they've been convicted of that crime, I don't think is incrementally so prejudicial as to warrant it being excluded, but that's not the end of the discussions. [¶] In the [section] 290 [(failure to register)] charge, it also must be proved that the defendant failed to make that registration. In this case, it's a failure of no more than a couple of days, I think. . . . [¶] . . . [¶] . . . It's clear [defendant] has not changed his address. It's clear that these allegations in the current case were not facilitated by a failure to register. There's nothing about a failure to register that made these alleged offenses possible. [¶] In addition, I will entertain any instruction to the jury that they are not to consider failure to register in determining the guilt on the substantive charges, and I will assume the jury will follow that instruction." As for defendant's motion to bifurcate the trial of the prior conviction allegations, defendant's trial counsel agreed that it would be "futile to bifurcate [the prior conviction allegations]" given the trial court's ruling that evidence of those convictions was admissible pursuant Evidence Code section 1108, and the trial court denied the motion.

14

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." The law favors consolidation of charges. (*People v. Ochoa* (1998) 19 Cal.4th 353, 409.) "Joinder of criminal charges for trial benefits the public by reducing delay in the disposition of criminal charges, and it benefits the state by conserving judicial resources and public funds." (*People v. Hill* (1995) 34 Cal.App.4th 727, 735.) Whether offenses are properly joined under section 954 is a question of law which we review de novo; the decision whether separate proceedings are required in the interests of justice is reviewed for an abuse of discretion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 984.)

The parties agree that the failure to register count was not properly joined with the remaining counts under section 954; however, we need not decide this issue because any error in failing to grant the severance motion was harmless. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 931-932 [reviewing trial court's failure to sever under harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836], disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459.) As the trial court observed, evidence of the prior convictions giving rise to defendant's obligation to register as a sex offender was admissible under Evidence Code section 1108. Moreover, the charged sex offenses were alleged to have occurred within days of defendant's failure to register, and thus, were not facilitated by his failure to register. Accordingly, it is not reasonably probable that a result more favorable to defendant would have been reached if the failure to register count had been severed from the trial of the remaining counts.

Turning to the motion to bifurcate, "a trial court, through the exercise of its general powers under section 1044, *may* order that the determination of the truth of a prior conviction allegation be determined in a separate proceeding before the same jury, after the jury has returned a verdict of guilty of the charged offense." (*People v.*

15

*Calderon* (1994) 9 Cal.4th 69, 75.) "[T]he denial of a defendant's timely request to bifurcate . . . is an abuse of discretion where admitting, for purposes of sentence enhancement, evidence of an alleged prior conviction during the trial of the currently charged offense would pose a substantial risk of undue prejudice to the defendant." (*Id.* at pp. 77-78.) Bifurcation of the determination of the truth of a prior conviction allegation, however, "is *not* required . . . when, even if bifurcation were ordered, the jury still would learn of the existence of the prior conviction before returning a verdict of guilty." (*Id.* at p. 78) Such is the case here where evidence of defendant's prior convictions was admissible under Evidence Code section 1108. Accordingly, the trial court did not err in denying the motion to bifurcate the prior conviction allegations.

III
The Prosecution Satisfied Its Burden of Providing Some Evidence of the Corpus Delicti of the Crime of Committing an Act of Oral Copulation with a Person Physically or Mentally Incapable of Giving Consent

Defendant next contends that his conviction for committing an act of oral copulation with a person physically or mentally incapable of giving consent (count one) must be reversed under the corpus delicti rule because "there is no independent proof, apart from [his] extra judicial statements, that any oral copulation occurred." We disagree.

In a criminal trial, the prosecution must prove the corpus delicti of the crime -- that is, the fact of injury, loss, or harm and the existence of a criminal agency as its cause -- without relying exclusively upon the defendant's extrajudicial statements, confessions, or admissions. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).) This requirement of independent proof precludes conviction based solely on a defendant's out-of-court statements. (*Id.* at p. 1178.) It "requires *corroboration* of the defendant's extrajudicial utterances insofar as they indicate a crime was committed, and forces the People to supply, as part of their burden of proof in every criminal prosecution, some evidence of the corpus delicti aside from, or in addition to, such statements." (*Ibid.*,

16

italics omitted.)  "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible.  [Citations.]  There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency.  (*People v. Jones* [(1998)] 17 Cal.4th 279, 303.)  In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues.  [Citations.]"  (*Id.* at p. 1171.)  Where, as here, the sufficiency of evidence necessary to establish the corpus delicti is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether there was sufficient independent evidence, apart from the defendant's extrajudicial statements, to establish a prima facie showing of the elements of the corpus delicti.  (*People v. Jennings* (1991) 53 Cal.3d 334, 364.)  "When undertaking such review, our opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment."  (*People v. Hill* (1998) 17 Cal.4th 800, 849 (*Hill*).)

Viewed in the light most favorable to the judgment, the evidence showed that in February 2008, defendant and A.M. were seen passionately kissing in the cafeteria at UC Davis Medical Center.  A.M. was also observed grabbing defendant's "genital area" as defendant playfully pushed her hand away.  A week later, A.M. refused to allow her doctor to perform a pelvic exam, and H.M. told the doctor that defendant had abused A.M.  This evidence gives rise to an inference that defendant and A.M. had engaged in sexual activity of some kind, and given A.M.'s limited mental capacity, that she was unable to consent thereto.  Such evidence is sufficient to establish the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency.

17

Defendant claims the prosecution failed to establish the requisite prima facie showing because "there was no evidence of oral copulation" apart from his extrajudicial statements to police. *People v. Jones* (1998) 17 Cal.4th 279 (*Jones*), cited by both parties, is instructive. In that case, our Supreme Court analyzed the corpus delicti rule and the requirement for corroboration in the context of an oral copulation charge. (*Id.* at p. 299.) The victim, a woman, was discovered lying in the dirt near an isolated road with a gunshot wound to her head. (*Id.* at p. 291.) She was alive when she was found, but died shortly thereafter. (*Ibid.*) Semen was found in her vaginal, rectal, and external genital areas. (*Id.* at p. 302.) No semen was found in the victim's mouth; however, an expert testified that negative test results were not inconsistent with oral copulation because the mouth's natural rinsing processes eliminate semen. (*Ibid.*) The victim was not wearing underpants, a bra, or shoes. (*Ibid.*) During his interrogation the day after the victim's murder, the defendant stated that his partner forced the victim to orally copulate him in the backseat of the car while defendant drove. (*Id.* at p. 300.) The defendant was charged with, among other things, forcible oral copulation, apparently as an accomplice. (*Ibid.*) The defendant argued "that the lack of evidence of the specific loss or harm to this victim is fatal to the establishment of the corpus delicti." (*Id.* at p. 302.) The Supreme Court rejected the argument, stating: "[W]e have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved." (*Id.* at p. 303.) The court found that there was sufficient evidence to establish the corpus delicti for oral copulation notwithstanding the lack of independent evidence of "oral-genital or oral-anal contact," (*ibid*.) reasoning: "The state of the victim's clothing (no underwear or shoes) and the forensic evidence (semen in the victim's vagina and on her external genitalia and anus) indicates multiple sexual acts occurred. That the victim was forcibly abducted, beaten, shot in the head, and left by the

18

side of the road for dead gives rise to an inference that the sexual activity that occurred was against the victim's will. This circumstantial evidence of multiple forcible sexual acts sufficiently establishes the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency." (*Id.* at p. 302.)

As in *Jones,* the lack of independent evidence of oral-genital contact here is not fatal. Defendant's sexualized relationship with A.M. as evidenced by their conduct in the cafeteria, defendant's prior convictions, H.M.'s statement that defendant had abused A.M., and A.M.'s refusal to undergo a pelvic exam, give rise to an inference that defendant and A.M. had engaged in sexual conduct of some sort, and the circumstantial evidence of such, coupled with evidence of A.M.'s inability to consent to such conduct, establishes the requisite prima facie showing of both an injury, loss or harm, and the involvement of a criminal agency. That an equally plausible innocent inference may be drawn from the same facts is of no consequence. (*Hill, supra,* 17 Cal.4th at p. 849.)

IV

No Unanimity Instruction Was Required

Defendant was charged with one count of committing an act of oral copulation with a person physically or mentally incapable of giving consent. He asserts that there was evidence before the jury of multiple acts that could have been the basis of that charge and the prosecutor did not make a clear election as to which acts he was relying on. In particular, he notes that during his interrogation, a tape of which was played for the jury, he said that two or three times during the past ten years he dreamed that he was "getting a blow job," woke up, and A.M. was over his penis, and that the last time this occurred was a month or so prior to the interrogation. Accordingly, he argues that the trial court had a sua sponte duty to instruct the jury that in order to find him guilty of that charge, it must unanimously agree on which specific action constituted the offense. Our review of the record satisfies us that an election was made, and thus, no unanimity instruction was required.

19

A criminal defendant is entitled to a verdict in which all 12 jurors concur as a matter of due process under the state and federal Constitutions. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) In any case in which the evidence would permit jurors to find the defendant guilty of a crime based on two or more discrete acts, either the prosecutor must elect among the alternatives or the court must require the jury to agree on the same criminal act. (*Id*. at pp. 1132-1133.) Where it is warranted, the court must give the instruction sua sponte. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

"If the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction. The record must show that by virtue of the prosecutor's statement, the jurors were informed of their duty to render a unanimous decision as to a particular unlawful act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 (*Melhado*).)

Here, the verdict form for count one made it quite plain that the prosecution was electing to base this count on the "last" incident described by defendant, namely the one that occurred a month or so prior to his interrogation. The verdict form for count one, which was given to the jury and signed by the foreman, identified the crime as "a violation of Section 288a [subdivision] (g) of the Penal Code of the State of California (an act of oral copulation (last time) with [A.M.]), as charged in Count One of the Information." Count one of the operative second amended information alleged in pertinent part: "On or about and between January 01, 2008, and May 6, 2008, . . . [defendant] did commit a felony namely: a <u>violation of Section 288a [subdivision] (g)</u> . . . in that said defendant did unlawfully commit an act of oral copulation (last time) with [A.M.] . . . ." Both the verdict form and the information referenced therein specifically refer to the "last time," and it was clear from defendant's statements to police, which the jury heard, that the "last time" was a month or so prior to defendant's interrogation.

On this record, we conclude the prosecutor "elect[ed] the specific act relied upon to prove" count one, namely the "last time," which occurred a month or so prior to the May 2008 interrogation, and that the election was clearly communicated to the jury via the verdict form. (*Melhado*, *supra*, 60 Cal.App.4th at p. 1534.) Accordingly, the trial court had no duty to instruct on unanimity.

V

Defendant's Convictions for Lewd and Lascivious Acts on a Dependent Person by a Caretaker Must Be Reversed Because Defendant Is Not a "Caretaker" Under Section 288, Subdivision (c)(2)

Finally, defendant contends his convictions for lewd and lascivious acts on a dependent person by a caretaker (counts two and three) must be reversed because he is not a "caretaker" as that term is defined in the applicable statute. We agree.

Defendant was convicted in counts two and three of violating section 288, subdivision (c)(2), which provides in pertinent part: "Any person who is a caretaker and commits an act described in subdivision (a) upon a dependent person, with the intent [of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the dependent person], is guilty of a public offense . . . ."

As used in section 288, subdivision (c)(2), " '[c]aretaker' means an owner, operator, administrator, employee, independent contractor, agent, or volunteer of any of the following public or private facilities when the facilities provide care for elder or dependent persons: [¶] (A) Twenty-four hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code. [¶] (B) Clinics. [¶] (C) Home health agencies. [¶] (D) Adult day health care centers. [¶] (E) Secondary schools that serve dependent persons and postsecondary educational institutions that serve dependent persons or elders. [¶] (F) Sheltered workshops. [¶] (G) Camps. [¶] (H) Community care facilities, as defined by Section 1402 of the Health and Safety Code, and residential care facilities for the elderly, as defined in Section 1569.2 of the Health and Safety Code. [¶] (I) Respite care facilities. [¶] (J) Foster homes. [¶] (K) Regional centers for persons

21

with developmental disabilities. [¶] (L) A home health agency licensed in accordance with Chapter 8 (commencing with Section 1725) of Division 2 of the Health and Safety Code. [¶] (M) An agency that supplies in-home supportive services. [¶] (N) Board and care facilities. [¶] (O) Any other protective or public assistance agency that provides health services or social services to elder or dependent persons, including, but not limited to, in-home supportive services, as defined in Section 14005.14 of the Welfare and Institutions Code. [¶] (P) Private residences." (§ 288, subd. (f)(1).)

"[P]aragraph 2 of subdivision (c) appl[ies] to the owners, operators, administrators, employees, independent contractors, agents, or volunteers working at these public or private facilities and only to the extent that the individuals personally commit, conspire, aid, abet, or facilitate any act prohibited by . . . paragraph 2 of subdivision (c)." (§ 288, subd. (g).) It "do[es] not apply to a caretaker who is a spouse of, or who is in an equivalent domestic relationship with, the dependent person under care." (§ 288, subd. (h).)

Defendant submits that section 288, subdivision (c)(2) does not apply to him because he was not *working* at one of the enumerated public or private facilities, as required under section 288, subdivision (h), at the time he is alleged to have committed the offense. According to defendant, "the statutory language does not encompass a father of a dependent person who does not work in a 'facility,' " and the fact that defendant "lived in his own home with his daughter who had Down's syndrome . . . did not make him an owner or employee of a 'facility' established to care for dependent persons." The People respond that "the term 'caregiver' [*sic*] is meant to encompass all people who give care to a dependent adult." The People further assert that "the evidence established that [A.M.] lived in [defendant's] home, and that [defendant] was at least in part responsible for her care and well-being," and that "[b]ased on this evidence, it would be reasonable for the jury to infer that [defendant] was, at the very least, a volunteer caregiver providing care for [A.M.] out of his home, a private residence."

22

This case involves a matter of statutory construction, namely whether a parent of a dependent person who assists in caring for that dependent person at home is a "caretaker" within the meaning of section 288. " 'Under well-established rules of statutory construction, we must ascertain the intent of the drafters so as to effectuate the purpose of the law. [Citation.] Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.' [Citation.]" (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.) "When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to rules or maxims of construction 'which serve as aids in the sense that they express familiar insights about conventional language usage.' [Citation.] Courts also look to the legislative history of the enactment." (*Ibid.*)

Here, had the Legislature intended for the term caretaker to encompass "all people who give care to a dependent adult," as the People claim, the Legislature could have dispensed with section 288, subdivision (f)(1), setting forth the definition of "caretaker," or simply provided that, " 'Caretaker' means anyone who gives care to a dependent adult." That, however, is not what it did. Instead, it delineated 7 different classes of persons who may qualify as a caretaker ("an owner, operator, administrator, employee, independent contractor, agent, or volunteer") and 16 "public or private facilities" at which the care must be provided. (§ 288, subdivision (f)(1).) The specificity of subdivision (f)(1) strongly suggests that the Legislature did not intend the term caretaker to encompass all people who care for dependent adults, whoever they are and wherever the care is provided.

Nor are we persuaded that defendant was a "volunteer" under section 288, subdivision (c)(2), as the People claim. A "volunteer" is "a person who voluntarily undertakes or expresses a willingness to undertake a service." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) at p. 1402.) A parent, however, is not a volunteer when

23

it comes to caring for a dependent child. A parent has a legal duty to care for and maintain a child, and this duty continues into adulthood in the case of a dependent child. (Fam. Code, § 3910; *Farber v. Olkon* (1953) 40 Cal.2d 503, 509 ["[A] father is required under the law to care for and maintain an incompetent adult child."] (*Farber*).)[3] Defendant was not a volunteer under section 288, subdivision (c)(2), and the People do not assert that defendant falls within any of the other classes of person who may qualify as a caretaker ("an owner, operator, administrator, employee, independent contractor, agent, or volunteer"). Nor is there any evidence in the record to support such a finding.

The People claim that the Legislature's exclusion of spouses of dependent persons or those in equivalent domestic relationships from subdivision (c)(2) evidences an intent on the part of the Legislature to include other types of family members, such as parents, in subdivision (c)(2). We are not persuaded. By limiting subdivision (c)(2)'s application "to the owners, operators, administrators, employees, independent contractors, agents, or volunteers working at [the enumerated] public or private facilities" (§ 288, subd. (g)), the Legislature evidenced an intent that subdivision (c)(2) *not* apply to intrafamilial relationships. That it chose to specifically exclude spouses of dependent persons or those in equivalent domestic relationships does not establish an intent to include other family members, such as parents. Sexual conduct is a normal part of marriage and equivalent

---

[3] *Farber* relies on Civil Code former section 206, which at that time provided in pertinent part: "It is the duty of the father, the mother, and the children of any poor person who is unable to maintain himself by work, to maintain such person to the extent of their ability." (Civ. Code, former § 206, enacted 1872.) As of January 1, 1994, Civil Code section 206 was repealed and reenacted as part of the new Family Code. (Stats. 1992, ch. 162, § 2, operative Jan. 1, 1994.) Family Code section 3910 restates without substantive change the first sentence of Civil Code former section 206 pertaining to the duty of a parent to maintain his or her incapacitated adult child. Subdivision (a) of Family Code section 3910 reads in pertinent part: "The father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means."

domestic relationships. Thus, it is easy to conceive of why the Legislature would want to specifically exclude those individuals from criminal liability for engaging in such conduct with a *dependent person*, which the Legislature defines as "any person who has a physical or mental impairment that substantially restricts his or her ability to carry out normal activities or to protect his or her rights . . . ." (§ 288, subd. (f)(3) [defining " '[d]ependent person' "].)  Because sexual conduct is not a normal part of a parent-child relationship, we do not interpret the Legislature's failure to specifically exclude parents of dependent persons from liability under subdivision (c)(2) of section 288 as evidencing an intent to include them in subdivision (c)(2) of section 288.

For all the foregoing reasons, we conclude that defendant is not a caretaker within the plain meaning of section 288, and that defendant's convictions on counts two and three must be reversed.

## DISPOSITION

Defendant's convictions on counts two and three are reversed and the sentences on those counts are vacated.  The judgment is affirmed in all other respects.  The superior court shall amend the abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


      BLEASE      , Acting P. J.


We concur:


      ROBIE      , J.


      MURRAY      , J.


25