[No. A064473. First Dist., Div. One. Apr. 28, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES RICHARD HILL, Defendant and Appellant.

COUNSEL

Kathy M. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ann K. Jensen and Christina V. Kuo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DOSSEE, J.**—Defendant is imprisoned for life without possibility of parole after a jury trial involving two separate incidents: robberies and first degree felony murder with special circumstances at a Taco Bell restaurant on July 4, 1992, and robbery and attempted premeditated murder at a Gas and Food market on August 11, 1992. On appeal, defendant primarily challenges the joinder of the two cases for trial. He also contends the trial court should not have admitted evidence that defendant solicited the killing of a victim-witness to prevent the witness's testimony and the trial court should not have limited defendant's cross-examination of the key prosecution witness. We affirm the convictions.

FACTS

*The Taco Bell Case*

Defendant had worked at the West Pittsburg Taco Bell from May 26 to May 29, 1992. He left the job saying he was moving out of town. In fact, defendant lived with his girlfriend across the street from the Taco Bell. Defendant told his girlfriend that Taco Bell made a lot of money and it would be a good place to rob.

On July 4, 1992, about 7 a.m., a Black man wearing an old, green, hooded army jacket pushed his way through the doors of the Taco Bell as the manager, Dinesh Trikha, was showing a new employee, Kim Van Nguyen, how to open up the restaurant. The man had a gun and conversed with Trikha, who then took the cash drawers out of the cash register and safe. (Kim Van Nguyen, who is Vietnamese, could not understand the entire conversation between Trikha and the robber.) The robber took the money, pointed a gun at Trikha's head, and led the men to a walk-in refrigerator at the back of the restaurant. Nguyen stood in the corner with his hands covering his head. After a brief exchange between Trikha and the robber, the robber shot Trikha in the face. Trikha died from the bullet wound, probably caused by a .357 magnum.

Nguyen ran to the doughnut shop nearby and summoned help. He was unable to identify defendant positively in court or in a photographic lineup, although he thought that defendant was "similar" to the robber.

A customer at the doughnut shop, Stephen Shilling, had seen a young Black man walking toward the Taco Bell in a green coat with a hood. The man tried to open the east doors, then went around to the north side of the building, then tried the east doors again, which were still locked. Shilling was suspicious. As Shilling left the doughnut shop in his car, he saw the man at a phone booth across the street. Shilling drove past the man slowly to try to get a look at his face. At trial, Shilling could not identify defendant as the man he had seen. Nor did Shilling identify defendant in a photo lineup.

Defendant's girlfriend, Maria Contreras, testified that early in the morning on July 4, defendant left their apartment with his cousin Marty; defendant was wearing a long, green army jacket with a hood. Before he left, defendant took a gun from another cousin, Red, who was sleeping in the living room; he said he would be right back. A few minutes later defendant telephoned and asked Contreras to call the Taco Bell to see if they were open. She did so and reported back to defendant that they were open. Defendant told her to keep their door unlocked. Soon thereafter defendant and Marty returned. Defendant was out of breath and had money in bills and rolls of coins. When his cousin Red looked out the window at the police activity at Taco Bell, defendant told him to get away from the window.

Later that day, after Contreras got home from work, defendant told her about the robbery at Taco Bell. He told her he had gone to the Taco Bell in the morning but found the doors locked. He then went to a phone booth and called her. He demanded money from the manager, and the manager gave it to him, but when defendant demanded money from a second safe the manager claimed he did not have the combination.

Defendant also told Contreras that when he ordered the two men into a freezer, the manager had pleaded with him not to hurt him. The manager called him by name, saying, "I'm not going to say anything . . . . James, take everything." Defendant told Contreras he shot the manager because he had called him by name. Nguyen, however, had covered his eyes and had had only a brief glimpse of defendant.

Defendant told Contreras that if anyone asked about the Taco Bell incident she should say he was asleep at the time.

That same afternoon, defendant and Contreras went to Contreras's mother's house for a family barbecue. There defendant gave the green jacket to Contreras's sister. Later, after defendant was arrested, defendant wrote to Contreras from jail and instructed her to throw the jacket away. Contreras did eventually take the jacket from her sister. But she turned it over to the

police. The witness, Stephen Shilling, was not sure if the jacket was the one he had seen on the suspicious-looking man at Taco Bell.

Before defendant's arrest, a composite sketch of the Taco Bell killer was published in the newspaper. Defendant showed it to Contreras and kept the clipping. Later, after his arrest, defendant wrote to Contreras from jail and asked her to burn the clipping.

Defendant was arrested on August 11 for the Gas and Food robbery. Defendant telephoned Contreras from jail and told her to stick to the story that he was at home sleeping during the Taco Bell robbery. On August 12, the police questioned Contreras about the Taco Bell incident, and Contreras told them exactly what defendant had told her to say. On October 28, however, Contreras went to the Pittsburg police and told them of defendant's involvement.[1] She turned over to Detective Williams of the Pittsburg Police Department the green army jacket and the letters defendant had written to her from jail. In one letter defendant said the police were accusing him of the Taco Bell shooting, and he reminded her that she was his alibi.

*The Gas and Food Case*

On August 11, 1992, about five weeks after the Taco Bell robbery, defendant robbed the Gas and Food market in West Pittsburg. About 2:50 in the afternoon, defendant entered the store, pulled out a gun and asked the clerk, Abdul Khaliq, for money. Defendant then shot Khaliq in the face and left.

Khaliq was only wounded and was able to follow defendant out of the store and get his license number. He called 911. About an hour later, the police located the car and arrested defendant along with three other young men. At first, defendant denied involvement, but eventually he admitted that he had committed the robbery and that his three friends had had nothing to do with it.

Defendant told the police he threw the gun into a vacant lot near his apartment. The police eventually retrieved the gun, a .22-caliber derringer, from a neighbor, who had found it in her backyard. Ballistics tests showed that the gun retrieved by police was the gun used against Khaliq. It was not,

---

[1]Contreras's motivation for coming forward was revenge. A few days beforehand defendant had admitted to her that he had been with another woman. Contreras was angry and wanted to hurt defendant.

During the period between defendant's arrest on August 11 and Contreras's discussions with police on October 28, Contreras acted as a paid informant of the Pittsburg Police Department, acting as a drug buyer.

however, the gun used to kill Dinesh Trikha in the Taco Bell case; the gun used in that shooting was a larger caliber.

Maria Contreras testified that a few days before August 11, she and defendant were shopping at Walmart, and she bought some .22-caliber bullets for a gun defendant had. She further testified that on August 11 she let defendant use her car while she was at work.

A few days after his arrest defendant told Contreras that he had pointed the gun at the clerk at the Gas and Food store, but as he was walking backwards, he bumped the door and the gun went off accidentally. A ballistics expert testified, however, that the gun used by defendant at Gas and Food did not have a hair trigger.

Contreras also testified that one day defendant telephoned her from jail and asked her to find a friend to shoot the clerk at Gas and Food so that there would be no witnesses against him. Later, he wrote to Contreras about the Gas and Food robbery, saying that if she could "have somebody rob the store again," then "they can drop the charges cause he would be dead." Defendant later told Contreras not to do it.

Detective Williams testified that when Maria Contreras came to tell him about defendant's involvement in the Taco Bell case she also discussed the Gas and Food case. She revealed that defendant told her he shot the clerk in the head because he thought a chest wound might not be fatal.

*Defense*

With respect to the Taco Bell killing, defendant presented evidence to suggest that someone else committed the crime.

Two witnesses who had been near the doughnut shop on the morning of the Taco Bell robbery testified to seeing two young Black men near the Taco Bell just before the robbery. The witnesses described the suspects' clothing, but neither witness described seeing a green army jacket.

Two other witnesses had reported to the police and to a defense investigator that Ike Daniels and Steve Hardy robbed the Taco Bell. At trial, however, one witness, Zephrine McDaniel, recanted her statements to the police. The second witness, Toni Woodall, denied having any knowledge of the case. She said she heard about the Taco Bell shooting from Zephrine McDaniel and told the police a story so she could get out of jail.

The police investigator testified that the two women had given several different versions of the murder, and neither had described the shooter as wearing a green army jacket.

Defendant also presented witnesses who testified that Maria Contreras had a reputation for lying.

## DISCUSSION

### I. *Joinder*

Defendant was indicted on crimes involving three incidents: the robberies and murder at Taco Bell; the robbery and attempted murder at Gas and Food; and a robbery at a video store. Defendant's motion to sever the crimes at Taco Bell from the others was granted as to the robbery at the video store but denied as to the crimes at Gas and Food. ▆▆ Defendant now argues that the trial court abused its discretion in denying his motion to sever the Taco Bell crimes from the others. We disagree.

Penal Code section 954 permits consolidation for trial of two or more offenses of the same class of crime. There is no question that the robberies and murder at Taco Bell were of the same class as the robbery and attempted murder at Gas and Food. (*People* v. *Miller* (1990) 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289] [murder and attempted murder]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 276 [247 Cal.Rptr. 1, 753 P.2d 1052] [murder and robbery].)

▆▆ Yet, even where joinder is statutorily authorized, severance may be required if joinder results in prejudice so great as to deny the defendant a fair trial. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) When substantial prejudice is clearly shown, a trial court's denial of a defendant's motion for severance constitutes an abuse of discretion. (*Id.* at p. 452.)

Before the voters' approval of Proposition 115 in 1990, the California Supreme Court had adopted a two-part test to determine whether the denial of a motion for severance was an abuse of discretion: (1) whether the evidence pertinent to one case would have been admissible in the other; and (2) even if the evidence was not cross-admissible, whether the prejudicial effect of joinder outweighed its benefits. (*Williams* v. *Superior Court, supra,* 36 Cal.3d at pp. 448-452.)

Defendant and the Attorney General devote much of their briefs to the first part of that test, the question whether the evidence in the two cases was cross-admissible, but we find it unnecessary to decide that question. Penal Code section 954.1, added by Proposition 115, expressly permits joinder of

offenses even when the evidence is not cross-admissible.[2] ■ In light of that statute, the sole question upon review of the denial of a motion for severance is whether the prejudice to the defendant from joinder of the cases outweighed the benefits. (*Belton* v. *Superior Court* (1993) 19 Cal.App.4th 1279, 1286 [24 Cal.Rptr.2d 34].)

Joinder of criminal charges for trial benefits the public by reducing delay in the disposition of criminal charges, and it benefits the state by conserving judicial resources and public funds. (*People* v. *Bean, supra,* 46 Cal.3d 919, 939-940; see also *People* v. *Mason, supra,* 52 Cal.3d at p. 935.)

The determination of prejudice to the defendant from joinder is necessarily dependent upon the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever. ■ The denial of severance may be an abuse of discretion if: (1) highly inflammatory offenses were joined with noninflammatory crimes; (2) a relatively weak case was joined with a relatively strong case so that the aggregate evidence had a spillover effect and altered the outcome on the relatively weak charges; and (3) one of the charges carried the death penalty. (See *Belton* v. *Superior Court, supra,* 19 Cal.App.4th at pp. 1286-1287; see also *People* v. *Sandoval, supra,* 4 Cal.4th at pp. 172-173; *Williams* v. *Superior Court, supra,* 36 Cal.3d at pp. 452-454.)

■ In our view, neither incident here was more inflammatory than the other. Both cases involved robberies in which the victim was shot. Defendant argues that the joinder of the two sets of offenses had the inflammatory effect of portraying defendant as a robber-murderer who robbed and killed routinely. This argument, however, is unavailing. Whenever a defendant is tried for multiple crimes of the same class, the jury will be presented with evidence that the defendant committed multiple offenses. This necessary concomitant of joinder is not sufficient to render the joinder unduly prejudicial. If it were, joinder could never be permitted. The danger to be avoided in joinder of offenses is that strong evidence of a lesser but inflammatory

---

[2]Penal Code section 954.1 provides: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, . . . evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact."

Even before the enactment of section 954.1, several Supreme Court cases decided after *Williams* clarified that the absence of cross-admissibility does not, by itself, preclude joinder. (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 173 [14 Cal.Rptr.2d 342, 841 P.2d 862] affirmed on other grounds *sub nom. Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]; *People* v. *Mason* (1991) 52 Cal.3d 909, 934 [277 Cal.Rptr. 166, 802 P.2d 950]; *Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 641 [257 Cal.Rptr. 550, 770 P.2d 1119]; *People* v. *Bean* (1988) 46 Cal.3d 919, 939 [251 Cal.Rptr. 467, 760 P.2d 996].)

crime might be used to bolster a weak case on another crime. (*People* v. *Mason, supra*, 52 Cal.3d 909, 934.) That danger was not present here where neither incident was significantly stronger or more inflammatory than the other.

Defendant further argues that the joinder had a prejudicial spillover effect as to both identity and intent. First, as to identity, defendant argues that because the identity as to the Gas and Food incident was strong (defendant having confessed that he was the robber), the jury was likely to conclude that defendant was also the robber of the Taco Bell, even though the evidence on the Taco Bell case was much weaker as to identity. Second, as to intent, defendant argues that the jury was likely to believe from the relatively strong evidence of intent to kill at the Taco Bell incident that defendant intended to kill again at Gas and Food.

We conclude, however, that neither case was so weak in evidentiary support that the aggregate evidence was likely to have affected the jury's verdict. The testimony of Ms. Contreras linking defendant to the Taco Bell incident, as well as defendant's letters to Ms. Contreras from jail, added strength to the Taco Bell case and obviated the danger of a spillover effect from the Gas and Food case. Moreover, the evidence of defendant's request to Ms. Contreras to have Abdul Khaliq (the victim in the Gas and Food case) killed in a staged robbery provided strong evidence quite independent of the Taco Bell evidence that defendant did not shoot Khaliq accidentally; that he intended to kill him in order to avoid detection. (See discussion in pt. II, *post.*)

Finally, although the Taco Bell case was charged as a special circumstance murder for which the prosecution sought the death penalty, this is not a case in which the joinder itself gave rise to the special circumstance allegation. (*People* v. *Sandoval, supra*, 4 Cal.4th at p. 173; cf. *Williams* v. *Superior Court, supra*, 36 Cal.3d at p. 454 [special circumstance of multiple murder].)

On balance, then, we conclude that defendant has failed to demonstrate undue prejudice resulting from the joinder of the charges at trial. We find no abuse of discretion in the trial court's denial of defendant's motion to sever.

## II.  *Evidence of Soliciting Murder of Victim*

Over defendant's objection, the prosecution was allowed to present evidence that while in jail awaiting trial defendant asked Maria Contreras to have Abdul Khaliq (the victim at Gas and Food) killed. At the end of trial,

the jury was instructed pursuant to a modified version of CALJIC No. 2.06 that this attempted suppression of evidence could be considered proof of consciousness of guilt.[3] Defendant acknowledges that evidence of an attempt to eliminate a witness would ordinarily be admissible to show fear of apprehension or consciousness of guilt, which in turn would be relevant to prove identity. ■ However, defendant argues that because identity was not an issue in the Gas and Food case (defendant having confessed to robbing and shooting Mr. Khaliq), the evidence of soliciting Mr. Khaliq's murder was irrelevant.

Defendant contends that the only issue in the Gas and Food case was defendant's mental state in shooting Mr. Khaliq. Defendant argues that neither a fear of apprehension nor a post hoc intent to kill the victim-witness is relevant to prove that defendant possessed the intent to kill at the time of the robbery. We reject the argument.

Defendant was charged in the Gas and Food case with the attempted premeditated murder of Abdul Khaliq, and, as defendant acknowledges, defendant's state of mind at the time of the shooting was at issue. Defendant raised the defense of accident, claiming that the gun discharged accidentally as defendant was backing out the door. The evidence under challenge here, that defendant later sought to have the victim killed to prevent prosecution, was relevant to refute this claim. The evidence tended to show that defendant had a motive for a deliberate killing: he shot Mr. Khaliq to eliminate him as a witness, not accidentally. Moreover, the evidence permitted the inference that defendant had a consciousness of guilt regarding his criminal state of mind and thus tended to prove defendant shot Mr. Khaliq with an intent to kill. By analogy, we note that the Supreme Court has held that evidence of flight from the scene to show consciousness of guilt is relevant not only when the identity of the perpetrator is at issue but also when the accused disputes the criminal implications of his conduct. (*People* v. *Turner* (1990) 50 Cal.3d 668, 694, fn. 10 [268 Cal.Rptr. 706, 789 P.2d 887] [defendant admitted the killing but claimed self-defense].)

The trial court weighed the probative value of this evidence against the danger of undue prejudice pursuant to Evidence Code section 352, and we find no abuse of discretion in the trial court's decision to admit the evidence.

---

[3]The jury was instructed as follows: "If you find that the defendant attempted to suppress evidence against himself in any manner, such as by the elimination of a witness, by destroying evidence, or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. [¶] However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

### III. *Cross-examination of Maria Contreras*

Defendant sought to impeach the credibility of Ms. Contreras pursuant to *People* v. *Wheeler* (1992) 4 Cal.4th 284, 290-297 [14 Cal.Rptr.2d 418, 841 P.2d 938], with evidence of her commission of acts of moral turpitude. Specifically, defendant sought to present evidence that Ms. Contreras acted as an aider and abettor of her new boyfriend, Reggie Smith, in the rape and sodomy of a 15-year-old girl. The trial court read the police report of the incident and concluded that Ms. Contreras was merely present at the scene; she was not an aider and abettor of the rape. Accordingly the trial court disallowed any impeachment testimony about Reggie Smith's acts of rape.

Defendant also sought to present evidence that Ms. Contreras had threatened the rape victim (Kimberly M.) for her accusations against Reggie Smith. The trial court allowed the evidence of threats.[4] On cross-examination, defendant questioned Ms. Contreras about the threats, but she denied making them. Defendant later called Kimberly M. as a witness, and she testified that Ms. Contreras threatened to kill her and her baby after she reported a criminal incident involving Reggie Smith to the police.

■ Defendant argues that he was improperly limited in his cross-examination of Ms. Contreras in that he was not allowed to elicit testimony concerning the nature of the crimes committed by Reggie Smith. Defendant argues that the excluded evidence, that Ms. Contreras was willing to threaten to kill in order to protect her boyfriend from the serious charge of *rape*, is qualitatively different from the evidence actually presented, that Ms. Contreras made threats to protect her boyfriend from a generic accusation.

We find no error. The trial court has broad discretion to exclude impeachment evidence under Evidence Code section 352. (*People* v. *Wheeler, supra,* 4 Cal.4th at p. 296.) Although wide latitude should be given to cross-examination designed to test the credibility of a prosecution witness, the court retains discretion to exclude collateral matters. (*Ibid.* see also *People* v. *Cooper* (1991) 53 Cal.3d 771, 816-817 [281 Cal.Rptr. 90, 809 P.2d 865].) We can find no abuse of discretion in the trial court's decision to exclude the details of sex offenses committed while Ms. Contreras was present but in which she did not participate.

Defendant elicited testimony from Ms. Contreras concerning her presence during an (unspecified) criminal incident involving her new boyfriend,

---

[4]Defendant also sought to present evidence that Ms. Contreras had discharged a firearm from her moving car. The trial court overruled the prosecutor's objection that the act was not an act of moral turpitude, and the court allowed the evidence.

Reggie; concerning her threats to the witnesses to that criminal incident; concerning her statements to the police about the incident. The exclusion of the nature or details of the crimes committed by Reggie Smith did not affect defendant's ability to show that Ms. Contreras had a motive for cooperating with police and, therefore, for testifying against defendant.

Nor did the exclusion limit defendant's ability to test the credibility of the witness. Defendant cross-examined Ms. Contreras about other factors affecting her credibility, including her relationship with the police, her chronic lies, and her psychiatric history.

The judgment is affirmed.

Strankman, P. J., and Newsom, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 27, 1995.