Filed 5/28/21  P. v. Olivas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ADRIEN OLIVAS,<br><br>    Defendant and Appellant. | H047834<br>(Monterey County<br>Super. Ct. No. 17CR000690) |

A jury convicted defendant Adrien Olivas of two counts of robbery (Pen. Code, § 211)[1] and found that, in the commission of both robberies, defendant was armed with a firearm (§ 12022, subd. (a)(1)) and personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)).  The jury also convicted defendant of simple assault (§ 240), after finding him not guilty of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).  Defendant was sentenced to an aggregate prison term of 19 years four months.

On appeal, defendant contends the trial court erred by admitting two items into evidence:  an Instagram post and a recorded jail call.  Defendant contends that even if neither of those evidentiary errors warrants reversal when considered individually, there was cumulative prejudice.  Defendant also contends the firearm enhancements must be reversed because there was no substantial evidence that the gun was real.

---

[1] Unspecified section references are to the Penal Code.

As we explain below, we find no abuse of discretion in the trial court's admission of the Instagram post and the jail call. We therefore find no cumulative prejudice. We find that substantial evidence supports the firearm enhancements. Thus, we will affirm the judgment.

## I. BACKGROUND

### A. *Robbery of Octavia Cleveland*

Octavia Cleveland met defendant around 2015 and went out on a few dates with him. In February 2017, she considered defendant to be a friend. Cleveland had a business selling marijuana edibles and tended to carry a lot of cash. Defendant was aware of her business. Before February 2017, Cleveland had not seen defendant for about nine months, but they kept in contact over Snapchat and Facebook.

On the morning of February 10, 2017, Cleveland was in a San Jose hotel room after taking a flight from the east coast. She received a message from defendant, asking her to come see him in Salinas. Cleveland called her friend Joseline Caliz because she wanted someone to help her drive. Caliz agreed to accompany Cleveland to Salinas.

Cleveland and Caliz met up with defendant at Red's Burgers in Salinas sometime after noon. Defendant was acting different than usual—he would normally be "social and nice" and would treat her and a friend to lunch, but he was already eating when they arrived.

After eating lunch, defendant asked Cleveland and Caliz to follow him to his apartment. Cleveland and Caliz drove to an apartment complex. Defendant told Cleveland to get into his car, and he told Caliz to stay in Cleveland's car. Defendant told Cleveland they would be going to a store.

As defendant and Cleveland drove in defendant's car, Cleveland fell asleep. When she woke up, defendant was holding a gun to her chest. Cleveland described the gun as, "Pretty heavy. Solid. I would say a .40 or—yeah, I would say a .40. Pretty big gun." Cleveland herself owned guns, and she had grown up around guns. She knew the

2

difference between different types and calibers of guns. She believed the gun was real "because of the weight of the gun" and because she "kn[e]w guns."

Defendant told Cleveland, "Bitch, give me all your money." Cleveland was "shocked." Defendant threatened to shoot Cleveland if she did not give him her money, so she gave him the $2,500 cash she had, as well as her wallet, which contained her credit cards and driver's license, and her Louis Vuitton purse.

Defendant pointed the gun at Cleveland's head at some point. Defendant then pointed the gun at Cleveland's legs or feet, as he looked for money inside her boots. The car was stopped, and Cleveland opened the car door. Defendant told Cleveland, "I know you have more cash." Cleveland replied, "This is it." Defendant began to drive off and pushed Cleveland out of the car. She rolled on the ground and moved her leg away from the car so she did not get run over. Defendant fled in his car.

Cleveland found herself in an agricultural field, without a phone. She ran through some woods until she saw a car approaching. She screamed and waved her hands, and the car stopped. She told the driver—Jose Manuel Ochoa Anguino (Ochoa)—that she needed help, and she used his cell phone to call the police at 2:40 p.m.

Ochoa testified that he had pulled over to make a phone call when he encountered Cleveland, who had come out of some bushes. It had been raining, and Cleveland was wet, scared, and crying. Her hands were bloody, and she said her knees and hips hurt. Cleveland had dirt on the back of her shirt and on the knees of her pants. She had suffered scrapes on her lower back, shoulder, and hand. Cleveland said she had been robbed and thrown out of a car. She mentioned that there had been a handgun.

Cleveland waited for a deputy to arrive and then directed him back to Red's Burgers, which was the only location she could remember. On the way there, a dispatch for a "211, white female" came through. Cleveland believed the call related to Caliz. Indeed, when the deputy drove her to the location of the dispatch, Caliz was there. Caliz and Cleveland were both crying, but happy to both be "in one piece."

3

After the robbery, Cleveland noticed some unusual withdrawals from her bank account. On February 12, 2017, almost $4,000 was withdrawn. On February 14, 2017, there were debit purchases for $375 and $3,043.20. Cleveland called her bank to report the fraudulent activity.

Cleveland was fearful about testifying. She explained that a friend had sent her an Instagram post that said "deathtorats." The post had Cleveland's and Caliz's names and addresses, documents from the case, and a picture of a dead rat. The post also said, "Snitches get stitches." Cleveland was aware that "a rat is basically someone that tells the police stuff." Cleveland identified photographs of the Instagram post and the attached confidential information.

### B. *Robbery of Joseline Caliz*

While defendant and Cleveland were gone, Caliz waited in Cleveland's car for about 15 or 20 minutes. Someone told her to move the car, so she did. After another person told her to move the car again, Caliz parked on the street. Caliz began to worry about Cleveland and tried calling her several times.

Eventually, Caliz saw defendant's car return. Cleveland was not in the car. Defendant approached Caliz, who asked where Cleveland was. Defendant said Cleveland was in an upstairs apartment and that Caliz should follow him; she did.

As Caliz walked up a stairway, defendant turned around. He was pointing a gun at Caliz, and he told Caliz to give him her wallet, which contained ATM cards and about $300 cash. The gun was a black and gray handgun, which might have been a .45-caliber. Defendant was "[v]ery serious." Caliz gave defendant her wallet. Defendant then ran off.

Caliz returned to Cleveland's car. She called a cousin and drove around looking for Cleveland. She then returned to the apartment complex, where she called 9-1-1 at 3:10 p.m. Police arrived on scene five minutes later. When an officer responded, he saw

4

that Caliz was "visibly upset." It appeared that Caliz had been crying. When Cleveland arrived, she and Caliz appeared "extremely happy to see each other."

Caliz testified that she was in fear at the time of her testimony, because she had also seen the Instagram post that referenced a "snitch" and "rats" and contained personal information about her and Cleveland.

## C. *Investigation*

### 1. *Financial Transactions*

In February 2017, defendant had an account with Square, which provides software and hardware for making payments by cell phone. Defendant's account was for a jewelry business. Five of Cleveland's credit cards and three of Caliz's credit cards had been "swiped" on a device connected to defendant's account.

Starting on February 10, Cleveland's and Caliz's credit cards were "swiped" or the card numbers manually entered, although some of the transactions did not go through.[2] The transaction attempts began at 3:19 p.m., with transaction amounts between $300 and $4,106. Some of those transaction amounts included a "tip." There were multiple additional transactions attempts for $525.32 starting at 3:25 p.m. Numerous other swipes, for various amounts, were also reflected in defendant's Square account records. The records showed that the swipes occurred in Salinas.

There were also attempted "peer-to-peer" transfers of money from an account associated with Cleveland's credit card to defendant's account. One such transfer was for $357, with a note indicating the transfer was for "engine work." Another, for $2,300, was noted as being for "jewelry." One of the peer-to-peer transactions was attempted at 3:21 p.m. on the day of the robbery.

Because of the multiple swipes and because the transactions that did not go through, Square's system flagged the account. In addition, Square received notice that

---

[2] Cleveland's account was overdrawn after the first two transactions.

the transactions were being disputed by the credit card holder. Square sent defendant nine inquiries seeking further information. Defendant responded to some of the inquiries. He provided a receipt indicating that the $3,043.20 was related to jewelry and included a tip of $507.20. Defendant claimed that one of the other transactions involved a gold watch and included a $75 tip. The tips were unusual for merchandise sales involving clothing or accessories.

### 2. *Defendant's Arrest and Jail Calls*

Defendant was arrested in December 2018.

In a redacted recorded call from jail, a female told defendant, "everything happens for a reason." Defendant responded by noting, "And I'll be locked up for 5 years." The female stated, "And you can move forward." Defendant remarked, "but now, . . . who knows if the bitch gonna show up again." The female responded, "That's what I'm saying. Maybe if we offer her money or something. I don't know. . . ." Defendant replied, "Man, you can't say this on the phone. Don't say nothing about that on this [expletive]. Don't say shit. Talking about the case or nothing." The female said, "Oh, I don't know. . . ." Defendant reiterated, "Don't say shit over the [expletive] phone."

In a second call from jail, defendant told a female that he had talked to his lawyer and that "everything [was] looking good" except for "that part when they did the Square account." The female reminded defendant that she had asked him to "close it," and defendant replied, "Yeah, exactly. Now I should've left it [expletive] open."

### 3. *Instagram Post*

An investigator with the district attorney's office contacted Instagram to try to identify the account associated with the post that Cleveland and Caliz had seen. The investigator was not able to locate the account, nor was he able to locate anyone who had received Instagram messages from the account.

6

## D. *Defense Case*

Defendant admitted he had been convicted of numerous felonies. He had a federal conviction for conspiracy to steal firearms, a conviction for using a scanning system to defraud, a forgery conviction, and two theft convictions, including a 2016 grand theft conviction. In each of those cases, he had pleaded guilty.

Defendant testified that he and Cleveland had been "really good friends." They met in person about once a month, and they also communicated through text messages and apps such as Snapchat.

In February 2017, defendant had a regular job at an auto body shop in Salinas. Defendant also had a side business selling jewelry and custom clothing. Cleveland had asked him to make a custom piece of jewelry for her: a diamond pendant in the shape of an "O" on a gold chain. Cleveland also wanted a watch.

When defendant had finished the pendant, he notified Cleveland and she came down to Salinas. Cleveland said she wanted to bring a friend and that they could engage in "fraudulent activities." Specifically, they would use defendant's merchant account and split the proceeds.

According to defendant, he met Cleveland and Caliz at his body shop, where he gave them the pendant and watch. Cleveland gave defendant "a line of credit card numbers," which he ran during his afternoon break. Defendant did not "really know too much" about using the app, so he met up with Cleveland and Caliz the next day and had Caliz swipe their credit cards. The plan was to get a police report so the cards could be reported as stolen. Defendant believed that all three of them were going to claim to be victims. However, the scheme "backfired" on him. Defendant did not know that Cleveland and Caliz had filed a police report accusing him of robbery until seven months later.

Defendant disputed the transactions involving the pendant and watch that Square notified him about, because he had actually provided those items to Cleveland and Caliz.

7

However, defendant acknowledged that he had forged Cleveland's name on the transaction for the pendant, claiming, "That was part of the scheme."

### E. *Verdicts and Sentence*

The jury convicted defendant of two counts of robbery (§ 211) and found that, in the commission of both robberies, defendant was armed with a firearm (§ 12022, subd. (a)(1)) and personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)). The jury also convicted defendant of simple assault (§ 240), after finding him not guilty of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).

Defendant was sentenced to an aggregate prison term of 19 years four months, as follows: the upper term of five years for the robbery in count 1 with a consecutive 10-year term for the section 12022.53, subdivision (b) enhancement; a consecutive one-year term for the robbery in count 2 with a consecutive term of three years four months for the section 12022.53, subdivision (b) enhancement; and a concurrent 180-day term for count 3. The remaining firearm enhancements were stayed pursuant to section 654.

## II.     DISCUSSION

### A. *Admission of the Instagram Post*

Defendant contends the trial court erred by admitting the Instagram post into evidence. He argues that the post was not properly authenticated; that the post should have been excluded pursuant to Evidence Code section 352; and that admission of the post violated his due process rights.

#### 1. *Proceedings Below – Motion in Limine*

Defendant filed a motion in limine to exclude the Instagram evidence, and the People filed a motion in limine to admit that evidence. At the hearing on motions in limine, the prosecutor explained the circumstances under which Cleveland received the Instagram post, and how receiving the post put Cleveland in "great fear of cooperating and [being] willing to testify."

Defendant's trial counsel objected, noting that the evidence consisted of "a very poor screenshot" and that the prosecution could not show "where this was posted, when it was posted." Defendant's trial counsel argued that admitting the Instagram post would be "much more prejudicial than probative" because it would "mislead the jury into thinking that [defendant was] involved in orchestrating some type of campaign against this woman." He also pointed out that the post had not been sent directly to Cleveland; someone else had seen the post, taken a screenshot, and showed the screenshot to Cleveland.

The prosecutor acknowledged that she had no evidence directly connecting defendant with the Instagram post, but she pointed out that the information in the post—specifically, the "confidential victim page" from defendant's police report—"circumstantially" tied the post to defendant. The prosecutor pointed out that only defendant had "incentive" to accuse Cleveland of being a "rat" and only defendant would have access to the document. The prosecutor also pointed out that the Instagram post was directed to Cleveland's friends and family members. The prosecutor asserted that Cleveland would testify that she remained fearful about testifying due to the Instagram post.

The trial court found that the Instagram post could be relevant to Cleveland's credibility and indicated that it would conduct an Evidence Code section 402 hearing before ruling. The trial court also indicated it might consider whether a limiting instruction could "offset" any potential prejudice. Additionally, the trial court wanted to observe Cleveland on the witness stand, to determine whether she was scared to testify. Thus, the trial court deferred ruling on the motion.

The following day, the trial court decided to have Cleveland testify and "see if the People can lay a foundation to establish that she is afraid to testify and does fear retaliation for testifying based . . . on that particular threat." The trial court precluded the prosecutor from asking Cleveland about the Instagram post until such a foundation was

9

laid.  The trial court indicated it had reviewed case law indicating that "the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility," and that the "source of the threat" did not matter.  The trial court again indicated that if it did admit the Instagram post, it would give the jury a limiting instruction to prevent the jury from inferring that defendant was responsible for the post.

Defendant's trial counsel "strenuously object[ed]" to admission of the Instagram post.  He noted that there was "no information from Instagram" and "no foundation that these were actually posted on Instagram."  He reiterated his argument that admission of the Instagram post would be more prejudicial than probative.

### 2.    *Proceedings Below – Limiting Instructions*

After Cleveland testified that she was "honestly" fearful about testifying, the trial court admonished the jury as follows:  "Now there's going to be evidence that the witness, Ms. Cleveland, is afraid to testify.  The explanation of the basis for that fear is only going to be admitted for a limited purpose.  You may only consider that evidence to evaluate or to judge the credibility or believability of Ms. Cleveland.  You may consider that evidence for that purpose alone.  You may not consider it for any other purpose. [¶] You may not use that to derive any inference that would tend to show that—or suggest that [defendant] is guilty.  Again, it's only going to be allowed for the limited purpose to judge the believability or credibility of Ms. Cleveland."  The trial court asked any juror who did not understand the instruction to raise their hand.  No juror raised a hand.

After Caliz testified that she, too, was in fear about testifying, the trial court again admonished the jury:  "[T]he evidence concerning the message that was just testified to, the Instagram message, that that is a message that is being offered just for the limited purpose of allowing you to evaluate the believability and credibility of the witness, Ms. Joseline Caliz.  It's not being offered for the truth of the matter asserted. [¶] So, again, you're to only use it for the limited purpose of evaluating the believability and the

10

credibility of Ms. Caliz." The trial court again asked any juror who did not understand the instruction to raise their hand. No juror raised a hand.

The jury was later instructed pursuant to CALCRIM No. 303: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

### 3. Closing Arguments

During argument to the jury, the prosecutor discussed Cleveland and Caliz's "attitudes about testifying." The prosecutor argued that it was not believable that Cleveland and Caliz would come to Salinas to engage in the credit card scheme that defendant had described. She asked, "Why would they do that? Especially if they received a threat where they're being labeled a[s] 'Scandalous bitches, that's snitching in the bay.' " The prosecutor noted that the document containing Cleveland and Caliz's addresses was not a public document. She argued, "They got this threat and they were in fear. You heard them testify. They told you what the term 'snitch' means to them. That basically it has a connotation in association with being killed, being labeled as a rat. They came in here, they were in fear. Why would they go through all of this and have this fear still of testifying after two years? Why would they do that?"

Defendant's trial counsel argued that the Instagram posts had "absolutely zero reliability."

### 4. Standard of Review

We apply the abuse of discretion standard of review to "any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 724 (*Waidla*).) Under this deferential standard, the trial court's ruling will " 'not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

11

*5.      Authentication*

"Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law."  (Evid. Code, § 1400.)  "Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).)  "The statutory definition ties authentication to relevance."  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).)

"As with other writings, the proof that is necessary to authenticate a photograph or video recording varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error.  [Citation.] The first step is to determine the purpose for which the evidence is being offered.  The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case.  [Citation.]  The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine *for the purpose offered*.  [Citation.]  Essentially, what is necessary is a prima facie case.  'As long as the evidence would support a finding of authenticity, the writing is admissible.  The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' "  (*Goldsmith*, *supra*, 59 Cal.4th at p. 267, italics added.)

In arguing that the Instagram post was not properly authenticated, defendant appears to assume that the Instagram post was admitted to show that he was responsible for creating or distributing the post.  Defendant argues, "No evidence was presented that the messages were sent from [defendant's] computer or phone."  However, the Instagram post was expressly admitted only for the limited purpose of reflecting on the credibility of Cleveland and Caliz.  The Instagram post was admitted to show why Cleveland and Caliz were scared to testify, not to show that defendant was the person who was responsible for causing their fear—i.e., by creating or distributing the post.

12

Thus, the cases defendant relies on are inapposite. In *People v. Beckley* (2010) 185 Cal.App.4th 509 (*Beckley*), the defendants were convicted of a gang-related murder and two attempted murders. (*Id*. at p. 512.) Defendant Beckley and his girlfriend testified that they were no longer gang members. (*Id*. at p. 513.) In rebuttal, the prosecution presented a photograph of the girlfriend flashing a gang sign. A detective testified that he had downloaded the photograph from defendant Beckley's MySpace page. (*Id*. at p. 514.) The *Beckley* court determined that there was insufficient evidence to show that the photograph was "an accurate depiction" of the girlfriend flashing a gang sign. (*Id*. at p. 515.) The gang detective had no personal knowledge that the photograph "truthfully portrayed" the girlfriend flashing a gang sign, since he had not been present when the photograph had been taken, and there was no expert testimony that the photograph "was not a ' "composite" or "faked" ' photograph." (*Ibid*.)

The photograph in *Beckley* was admitted to show proof of an element of gang allegations, and thus it was relevant only if it accurately portrayed the defendant's girlfriend flashing a gang sign. Because no one testified as to the photograph's accuracy, it was not sufficiently authenticated. In the instant case, however, the Instagram post was admitted for a different purpose: to show why Cleveland and Caliz were fearful of testifying. Thus, the post was relevant if it accurately portrayed what Cleveland and Caliz had seen. Because Cleveland testified that the Instagram post *was* the post she had seen, and Caliz described the post accurately, the Instagram post *was* sufficiently authenticated.

Defendant also discusses *In re K.B.* (2015) 238 Cal.App.4th 989 (*K.B.*), which criticized *Beckley* as setting forth authentication requirements that were too narrow, and which were inconsistent with *Goldsmith*. (*K.B.*, *supra*, at p. 997.) The *K.B.* court considered whether photographs, which depicted the minor possessing firearms, had been properly authenticated. The minor argued that, as in *Beckley*, no witness had personal

13

knowledge of whether the photographs were accurate and no expert had testified that the photographs were not altered or faked.  (*K.B.*, *supra*, at pp. 996-997.)

The *K.B.* court determined that the photographs of the minor possessing guns had been properly authenticated.  The photographs had been obtained from a cell phone seized from an adult who had been with the minor inside a residence from which two guns had been thrown out of a window.  Forensic investigation showed that the photographs had been created about five hours before the minor's arrest, and they had been posted on the minor's Instagram page that day.  (*K.B.*, *supra*, 238 Cal.App.4th at p. 998.)  When the minor was arrested, he was wearing the same clothes as in the photographs, he was in the same location as depicted in the photographs, and he was with some of the same people who appeared with him in the photographs.

Defendant argues that *K.B.* "demonstrates what is required for an Instagram post to be properly authenticated," and he asserts that the prosecution here did not use any of the methods approved in *K.B.*  In *K.B.*, however, the photographs were relevant only if they accurately depicted the minor possessing firearms.  In the instant case, the Instagram post was not admitted for a similar purpose.  Contrary to defendant's assertion, the Instagram post was not admitted to show that defendant "was the one who created the Instagram page" or that defendant was the person who had disseminated the Instagram page.  Rather, the Instagram post was admitted to show why Cleveland and Caliz were fearful about testifying.  By identifying the Instagram post as the one that put them in fear, Cleveland and Caliz provided adequate authentication.

Unlike the photographs considered in *Beckley* and *K.B.*, the Instagram post in this case was not admitted to show "*a person doing something*."  (See *People v. Cruz* (2020) 46 Cal.App.5th 715, 731 (*Cruz*).)  Nor was the Instagram post admitted to show that defendant was the person who had created or sent it.  (See *ibid.*)  The Instagram post was admitted for the limited purpose of reflecting on the credibility of Cleveland and Caliz.  Considering that purpose, the trial court did not err by determining that, by identifying

14

and describing the Instagram post, the trier of fact could find that the post was "genuine for the purpose offered." (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.) Thus, the trial court did not abuse its discretion by admitting the Instagram post over defendant's authentication objection.

6. *Evidence Code Section 352*

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence is substantially more prejudicial than probative "if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*Waidla*, *supra*, 22 Cal.4th at p. 724.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Rather, " '[t]he "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*Ibid.*)

Defendant asserts that the Instagram post was not relevant because Cleveland did not show that she was in fear when she testified. Defendant notes that the trial court indicated it would exclude the post if Cleveland was not showing fear when she testified. However, Cleveland explicitly testified that she *was* fearful about testifying. Defendant does not explain what other evidence he believes the record should have shown in order to support a finding that Cleveland was in fear. Our Supreme Court has rejected the notion that evidence of a witness's fear of retaliation for testifying is limited "to circumstances in which the witness hesitates in his or her responses or when nervousness

15

or fear interferes with the witness's ability to testify truthfully." (*People v. Merriman* (2014) 60 Cal.4th 1, 86 (*Merriman*).) Moreover, we must defer to the trial court's implied finding that Cleveland was credible in asserting that she was fearful about testifying. (See *In re George T.* (2004) 33 Cal.4th 620, 634 ["the trier of fact is in a superior position to observe the demeanor of witnesses"].)

" 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court.' [Citation.] 'Moreover, evidence of a "third party" threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant. [Citations.]' [Citation.] 'It is not necessarily the source of the threat—but its existence—that is relevant to the witness's credibility.' [Citation.]" (*People v. Sandoval* (2015) 62 Cal.4th 394, 429-430 (*Sandoval*).)

Having established that the Instagram post was relevant to the credibility of Cleveland and Caliz, we turn to the question of whether the post's probative value was "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Defendant's prejudice argument is based on his assertion that the jury was likely to "speculate and be misled to believe that [defendant] made the threat on Instagram." We agree that the Instagram post created a potential for the jury to believe that defendant was associated with the post and its implied threats. On this record, the jury could have reached such a conclusion without resorting to speculation, because the Instagram posts contained a document that few people other than defendant "had access to." (See *Cruz*, *supra*, 46 Cal.App.5th at p. 731.) But the trial court's limiting instruction told the jury *not* to consider the Instagram post "to derive any inference that would tend to show that—or suggest that [defendant] is guilty," and to "only consider that evidence to

16

evaluate or to judge the credibility or believability" of Cleveland and Caliz.  Our Supreme Court has found that a similar instruction was sufficient to ensure that the jury limited its consideration of a threat to "evaluating the state of mind of the witness." (*Sandoval*, *supra*, 62 Cal.4th at p. 430.)  We reach the same conclusion here, finding the admonition was sufficient to ensure the jury did not infer that the Instagram post was created by or distributed by defendant.

In sum, we conclude the trial court did not abuse its discretion under Evidence Code section 352 by admitting the Instagram post.

### 7.    *Due Process*

Defendant contends the trial court's error in admitting the Instagram post violated his Fourteenth Amendment right to due process of law.  (See *People v. Partida* (2005) 37 Cal.4th 428, 439 [the erroneous admission of evidence results in a due process violation "if it makes the trial *fundamentally unfair*"].)  In other words, he argues that the trial court's error in admitting the post should be evaluated under the "harmless beyond a reasonable doubt" standard applicable to federal constitutional errors (see *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)) rather than the "reasonably probable" standard for state law errors (see *People v. Watson* (1956) 46 Cal.2d 818, 836).  However, we have determined that the trial court did not abuse its discretion by admitting the Instagram post.  Thus, we need not determine whether the error was harmless under any standard.

### B.    *Admission of the Recorded Jail Call*

Defendant contends the trial court erred by admitting the jail call in which he referenced being "locked up for 5 years."  Defendant contends that the evidence should have been excluded under Evidence Code section 352 and that the error violated his due process rights.

17

### 1. Proceedings Below

During trial, the prosecutor indicated she wanted to introduce a portion of a jail call between defendant and his mother, to show defendant's consciousness of guilt. Defendant pointed out that if the jury was to hear that defendant said, "I could be locked up for five years," the jury might think "that's the penalty," when in fact defendant's potential prison sentence was "much greater."

The trial court observed that defendant's statement "puts into context" the rest of the conversation and that the jury would be instructed not to consider punishment for any purpose. The trial court found that the jail call was relevant because defendant's statements could be interpreted as a discussion of ways to prevent Cleveland from testifying.

During closing argument, the prosecutor replayed the jail call for the jury and then asked, "is that an innocent person talking in there?" The prosecutor argued that defendant was referring to Cleveland when he expressed concerns about "the bitch" showing up to court. The prosecutor noted that defendant said he would "do five years," and that he had not ever denied committing the charged offenses. The prosecutor also noted that defendant had responded to the suggestion about paying Cleveland off by telling the female not to talk about that subject on the phone. The prosecutor concluded, "This is [the] talk of a person who knows they're guilty."

The trial court's instructions to the jury included CALCRIM No. 3550, which provided, "You must reach your verdict without any consideration of punishment."

### 2. Standard of Review

As noted above, we apply the abuse of discretion standard of review to "any ruling by a trial court on the admissibility of evidence." (*Waidla*, *supra*, 22 Cal.4th at p. 724.)

### 3. Evidence Code Section 352

Defendant contends that the jail call posed a "high risk of misleading the jury" because the jury was not supposed to consider the subject of punishment and defendant's

18

actual exposure was much greater than five years.  Defendant argues that the jail call had only "slight probative" value in showing that defendant was trying to influence Cleveland's testimony.

"It is fundamental that the trier of fact . . . must not consider the subject of penalty or punishment in arriving at its decision of guilt or innocence."  (*People v. Moore* (1968) 257 Cal.App.2d 740, 750.)  "It is improper to tell a noncapital jury about possible punishment because that subject is not only irrelevant to the jury's factfinding function, it has the potential to deflect the jury by inviting discussion and speculation about the results of whatever findings it makes."  (*People v. Ruiloba* (2005) 131 Cal.App.4th 674, 692-693.)

Here, the trial court admitted the jail call to show defendant's consciousness of guilt.  Indeed, the conversation suggested that defendant was admitting guilt and that he was considering ways to dissuade Cleveland from testifying.  "[E]vidence of an attempt to eliminate a witness" is admissible to show consciousness of guilt.  (*People v. Hill* (1995) 34 Cal.App.4th 727, 737; see also *Merriman*, *supra*, 60 Cal.4th at pp. 45-46.)  Likewise, evidence that " ' " 'the defendant has authorized the attempt of the third person to suppress testimony' " ' " is admissible to show consciousness of guilt.  (*People v. Williams* (1997) 16 Cal.4th 153, 200.)

Defendant's "undue prejudice" analysis (Evid. Code, § 352) focuses in large part on the fact that the jury heard that defendant could be sentenced to five years in prison when, in fact, he was ultimately sentenced to over 19 years in prison.  Defendant fails to explain how it was more prejudicial for the jury to learn that defendant was facing a five-year sentence than it would have been if the jury had learned of his actual exposure.  As the People point out, a jury's consideration of punishment can work both ways, in that " 'a jury may permit their consideration of guilt to be deflected by a dread of seeing the accused suffer the statutory punishment.' "  (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 687.)

In any event, here the trial court weighed the probative value of the evidence—i.e., its relevance in showing defendant's consciousness of guilt—against its potential for prejudice and determined that the potential for prejudice was adequately addressed by the admonition that the jury not consider punishment. Case law supports the trial court's finding that the jury could follow that instruction even after hearing about defendant's potential sentence. (See *People v. Thomas* (2011) 51 Cal.4th 449, 487.)

On this record, the trial court's weighing of the jail call's probative value against its potential for prejudice was not an abuse of discretion.

### 4. *Due Process*

Defendant contends the trial court's admission of the jail call violated his Fourteenth Amendment right to due process of law, such that the error should be evaluated under the "harmless beyond a reasonable doubt" standard applicable to federal constitutional errors. (See *Chapman*, *supra*, 386 U.S. at p. 24.) However, since we have determined that there was no error in the admission of the jail call, we need not determine whether the error was harmless under any standard.

### C. *Cumulative Prejudice*

Defendant contends that even if neither of the above evidentiary errors was prejudicial when considered independently, there was cumulative prejudice from the combination of the two errors. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) However, we have concluded that neither evidentiary ruling was an abuse of discretion. Therefore, there can be no prejudice to cumulate.

### D. *Firearm Enhancements*

Defendant contends the firearm enhancements must be reversed because there was no substantial evidence that the gun was real. Defendant points out that the firearm was

20

never recovered, and he posits that the gun could have been "an authentic looking replica or toy gun."

### 1. *Standard of review*

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320.) "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.)

### 2. *Analysis*

As defendant acknowledges, a firearm allegation can be found true even if the firearm is never found. "From testimonial descriptions of the weapon and its role in the commission of the crime, a jury may draw a reasonable inference of guilt. Reasonableness of the inference depends upon adequacy of the descriptions." (*People v. Hayden* (1973) 30 Cal.App.3d 446, 452, disapproved on other grounds by *People v. Rist* (1976) 16 Cal.3d 211, 222, fn. 10.) In *Hayden*, the court found substantial evidence supported a firearm use enhancement where "three victims testified that the robber pointed and threatened them with a weapon which they variously described as a gun, revolver and small caliber revolver." (*People v. Hayden*, *supra*, at p. 452.)

Defendant acknowledges that his argument is essentially foreclosed by *People v. Monjaras* (2008) 164 Cal.App.4th 1432. In that case, the defendant committed a robbery while displaying the handle of a black pistol tucked in his waistband. The victim had seen guns before but had never handled one. She believed that the gun was real but "could not say for certain whether it was 'a toy or real or not.' " (*Id*. at p. 1436.)

21

However, the jury could have found that the gun was real based on the defendant's " 'own words and conduct,' " which included threatening conduct. (*Ibid*.) The court explained that "when as here a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm." (*Id*. at p. 1437.)

In the present case, Cleveland's and Caliz's testimony about the gun—and about defendant's use of the gun—was sufficient for the jury to conclude that the gun was real. Cleveland, who had prior experience handling guns, described the gun as "heavy" and "[s]olid," and she estimated it to be a .40-caliber. Cleveland described how defendant pointed the gun at her and held it against various parts of her body while he demanded money and took her purse and wallet. Caliz testified that the gun was a black and gray handgun, which might have been a .45-caliber, and that defendant was "[v]ery serious" when he pointed it at her and demanded her wallet.

Substantial evidence supports the jury's findings that defendant was armed with and used a firearm.

### III.   DISPOSITION

The judgment is affirmed.

_____

                         Cogliati, J.[*]

WE CONCUR:

_____

Bamattre-Manoukian, Acting P.J.

_____

Grover, J.

<u>People v. Olivas</u>
H047834

_____

   [*] Judge of the Santa Cruz County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.