Filed 8/6/24  P. v. Odish CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAWOOD SALMAN ODISH,<br><br>    Defendant and Appellant. | D082344<br><br><br>(Super. Ct. No. SCE414182) |


APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randall Einhorn, and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Dawood Salman Odish appeals the judgment sentencing him to prison after a jury found him guilty of kidnapping and other crimes against a witness to an earlier shooting but was unable to reach a verdict on a charge

of assault with a firearm that arose out of the shooting. He contends the trial court prejudicially erred by denying his motion to sever charges for trial and by refusing to allow him to impeach the witness with felony convictions. We affirm.

## I.

## FACTUAL BACKGROUND

### A. *Odish's Relationship with B.T.*

Odish began dating B.T. in 2021. The two lived together in an apartment for about eight months and then in various hotels. B.T. has struggled with drug addiction since she was a teenager and has been in and out of jail because of the addiction. Her "drug of choice" is fentanyl, which she used "often" and "regularly." When she used fentanyl, she experienced auditory and visual hallucinations that caused her to make false accusations against family members. Odish disapproved of B.T.'s fentanyl use and got upset when she used it.

### B. *The Parking Lot Incident*

On August 31, 2022, S.M. was driving to El Cajon when he saw B.T. waving and stopped to help her. She asked for a ride to El Cajon, and he agreed to give her one. During the ride, B.T. asked whether she "could do drugs," and when S.M. said, "sure, no problem," she smoked something on foil through a straw. B.T. then asked S.M. to take her back to where he had picked her up so that she could retrieve a bag. S.M. drove her to a retail store and parked in the lot.

B.T. exited the car to retrieve the bag, and when she returned she was on the phone arguing with somebody. B.T. told S.M. her boyfriend was very jealous. While they were talking inside the car, a pickup truck pulled up from behind and blocked the car. A man whom S.M. later identified as Odish

2

exited the truck and pointed a handgun at S.M. through the passenger window of his car. Odish said, "You're messing with my girlfriend," and threatened to shoot and kill S.M. S.M. got out of his car and punched Odish, who then shot S.M. in the ankle. Odish drove off in his truck, and B.T. walked away.

A deputy sheriff who arrived at the parking lot in response to a report of the shooting found S.M. sitting in his car with a wounded right ankle. S.M. was taken to a hospital, where a bullet was retrieved from his ankle and given to the deputy. While he was in the hospital, S.M. was shown a photographic lineup that included Odish, but he did not identify Odish as the shooter.

A detective obtained footage from surveillance cameras at nearby businesses. The footage depicted a pickup truck that matched Odish's truck in the parking lot at the time S.M. was shot. The detective obtained telephone records that showed Odish called B.T. multiple times around the time of the shooting and his telephone connected to a tower less than a mile away from the parking lot.

C.     *The Mount Laguna Incident*

At approximately 6:00 a.m. on September 15, 2022, Klaus Kailing was driving his pickup truck along Sunrise Highway in Mount Laguna when he noticed B.T. walking in the middle of the road waving at him. The land surrounding the road was heavily covered with brush on both sides, and there were no homes or businesses nearby. Kailing noticed B.T. was wearing no shoes, had scrapes on her legs, and had "stickers and stuff in her socks, like she had maybe been out in the brush." He slowed his truck and asked her what was going on. B.T. responded "her boyfriend had tried to attack her," "she escaped," and she was alone and needed help. Kailing called 911.

While Kailing was talking to the 911 dispatcher, a sheriff's lieutenant drove by and saw B.T. standing in the middle of the road. The lieutenant noticed B.T. was disoriented, had scratches on her body, and had twigs and pieces of brush in her hair. When the lieutenant asked B.T. what happened, she said Odish had taken her there in his pickup truck and assaulted her, but she got away from him and hid in the bushes until he drove off. The lieutenant departed when sheriff's deputies and paramedics arrived on the scene and loaded B.T. into an ambulance for transport to a hospital.

One of the sheriff's deputies interviewed B.T. in the ambulance. When the deputy asked her what happened, B.T. answered, "My boyfriend beat me." B.T. said Odish picked her up at a hotel and during the drive accused her of cheating on him and threatened to kill her. She said Odish stopped the truck multiple times during the drive, struck her repeatedly on the face and back, and dragged her by the hair. She thought he was going to shoot her. B.T. said that during one of the stops she exited the truck and ran away.

B.T. gave a more detailed version of the events of September 15, 2022, to detectives after she arrived at the hospital. She said she was in a hotel room with two men when Odish arrived in his pickup truck at around 2:00 a.m., telephoned her, and threatened to hurt everyone in the room if she did not come out. When B.T. came out, Odish asked her why she was cheating on him and threatened suicide. She got into his truck, and he threatened to kill her, repeatedly hit her, and tried to burn her leg with a cigarette. After driving for some time, Odish stopped in a cul-de-sac and B.T. tried to run away. He grabbed her by the hair; dragged her back to the truck; and hit her face, head, and back. Odish threatened to shoot B.T. if she got out of the truck. Although she did not see a gun, she knew he kept one in the truck and had seen it the previous day. Odish continued driving and kept on hitting

4

B.T. until she opened the door, jumped out, and hid in the bushes. When Odish drove off, B.T. "flagged down two people."

The detectives asked B.T. about the August 31, 2022 shooting incident in the parking lot. She repeatedly stated she did not know S.M. and knew nothing about the shooting. B.T. also repeatedly said she was scared of Odish and he wanted her dead. She said he told her if he went to jail, he would send somebody to kill her.

D. *Odish's Storage Unit*

After Odish was arrested, detectives searched a storage unit he had rented. They found a red toolbox with a locked drawer that had been broken into. On a shelf, they found a handgun wrapped in a cloth, but it was not the one that was used to shoot S.M.

Detectives obtained footage from a surveillance camera at the storage facility. The footage showed Rebecca Trombly and an unidentified man removing several items from Odish's unit. The man removed a rifle case, and Trombly removed a bag that was later found at her residence and contained ammunition of the same type as that in the handgun found during the search of the unit.

A detective listened to recorded telephone calls Odish made to Trombly from jail. In one call, he said: "So I need you to go over there just to find out if they did something or not." Trombly responded she "was by there yesterday." Odish asked her whether she had gone "to the place," whether everything "was cool with it," and whether "the lock [or] anything was broken." Trombly answered she had gone and from what she could see "[e]verything look[ed] normal," but she "d[id]n't know a hundred percent" because "it's not finished yet." In a later call, Odish asked Trombly whether "everything . . . over there is safe." She responded she had "cleaned up at the

5

job site" and was able to get "all the big batteries out of the red box," but she "couldn't find any of the small batteries when [she] needed them for the job that [she] was finishing up today." Odish said the "small ones" were "in small drawers" and one was "loose." Trombly said: "I got it. . . . . I'll clean [up at] the job site tomorrow, and then I'll double check it again."

## II.

## PROCEDURAL BACKGROUND

### A. *Charges and Plea*

Based on the parking lot incident, the People charged Odish with assault with a firearm. (Pen. Code, § 245, subd. (a)(2); undesignated section references are to this code.) They alleged that in committing the assault, he personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury on S.M. (§ 12022.7, subd. (a)). Based on the Mount Laguna incident, the People charged Odish with kidnapping, inflicting corporal injury on a dating partner, and making a criminal threat. (§§ 207, subd. (a), 273.5, subd. (a), 422.) The People also charged Odish with conspiring with Trombly to conceal or destroy evidence (§§ 135, 182, subd. (a)(1)) and with possession of a firearm by a felon (§ 29800, subd. (a)(1)). They alleged Odish had a prior conviction that constituted a serious felony for purposes of a five-year enhancement (§ 667, subd. (a)(1)) and a strike for purposes of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12). Odish pled not guilty to all charges and denied all allegations.

### B. *Motions in Limine*

Odish moved in limine to sever charges for trial on the ground the assault on S.M. and the kidnapping and other crimes against B.T. occurred at separate times and places and had no common element. He also argued that trying the charges together would deny him a fair trial because evidence

6

concerning the separate incidents was not cross-admissible; the evidence of the shooting was inflammatory; and the jury might cumulate evidence concerning the separate incidents, the alleged conspiracy with Trombly, and the illegal possession of a firearm to find him guilty on some charge. The People filed opposition to the motion. They argued consolidation was proper because the crimes against S.M. and B.T. were of the same class in that they all involved violence against the person, and the crimes were connected in their commission in that B.T.'s witnessing the parking lot incident might have been the motivation for the Mount Laguna incident and Odish's jealousy of B.T. might have motivated both sets of crimes. The People also argued common evidence would be used to prove the charges. The trial court granted the motion to sever as to the charge of possession of a firearm by a felon and denied the motion as to the other charges.

Odish also moved in limine to admit for impeachment purposes evidence of B.T.'s felony convictions for possession of a controlled substance for sale (Health & Saf. Code, § 11351). The People acknowledged the convictions were admissible to impeach B.T. and "request[ed] that impeachment . . . be sanitized to 'convictions for felonies involving moral turpitude.' " The trial court noted B.T., S.M., and Odish all had committed prior bad acts that might be used to impeach them, and stated that it did not "want any of these prior acts in for impeachment" because they were "misleading" and "inflammatory." The court denied Odish's motion.

C.    *Trial, Verdicts, and Sentence*

The case proceeded to a jury trial. Testimony and other evidence established the facts summarized in part I, *ante*. When B.T. testified, she was wearing a jail uniform and said she had "been in and out of jail recently for the last couple months." She denied knowing S.M. or being at the parking

7

lot when he was shot. When asked about the Mount Laguna incident, she said: "I really don't remember much, honestly. It was a long time ago. I was high." B.T. said she did not want to testify against Odish and believed he was innocent.

The jury was unable to reach a verdict on the charge of assault with a firearm and found Odish guilty of kidnapping, inflicting corporal injury on a dating partner, making a criminal threat, and conspiring to conceal or destroy evidence. Odish waived his right to a trial on the prior conviction allegations and admitted he had a prior conviction that qualified as a serious felony and as a strike. He pled guilty to the charge of possession of a firearm by a felon, and as part of the plea agreement the charge of assault with a firearm was dismissed. At the sentencing hearing, the court refused to strike Odish's prior conviction for purposes of the Three Strikes law, struck it for purpose of the five-year enhancement, and imposed an aggregate prison term of 12 years 8 months.

## III.

## DISCUSSION

Odish contends the trial court prejudicially erred by denying his in limine motions to sever charges and to admit evidence of prior convictions to impeach B.T. We discuss each claim of error in turn.

A.  *Denial of Motion to Sever Charges*

Odish complains the trial court abused its discretion and deprived him of a fair trial by refusing to sever the assault with a firearm charge arising out of the parking lot incident from the kidnapping and other charges arising out of the Mount Laguna incident. We disagree.

Section 954 governs joinder and severance of charges for trial. Joinder is permissible when "two or more different offenses [are] connected together

8

in their commission" or are "of the same class of crimes or offenses." (*Ibid.*) Severance is permissible "in the interests of justice and for good cause shown." (*Ibid.*) "The law favors the joinder of counts because such a course of action promotes efficiency," but "a trial court has discretion to order that properly joined charges be tried separately." (*People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*).) Four factors are relevant to the exercise of that discretion: " '(1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 689 (*Westerfield*).) To prevail on a claim the trial court abused its discretion in denying severance, "a ' " 'defendant must make a clear showing of prejudice' " ' by demonstrating that the denial 'exceeded the bounds of reason.' " (*Ibid.*) "An appellate court evaluates such claims in light of the showings made and the facts known by the trial court at the time of the court's ruling." (*Merriman*, at p. 37; accord, *Westerfield*, at p. 689.)

Odish concedes the charges arising out of the parking lot and Mount Laguna incidents were "of the same class of crimes or offenses" and thus subject to joinder (§ 954) because the charges "share common characteristics as assaultive crimes against the person" (*People v. Lucky* (1988) 45 Cal.3d 259, 276). "Yet, even where joinder is statutorily authorized, severance may be required if joinder results in prejudice so great as to deny the defendant a fair trial." (*People v. Hill* (1995) 34 Cal.App.4th 727, 734.) Odish argues joinder of the charges caused such prejudice in his case because evidence as

9

to each incident would not have been cross-admissible in separate trials, and the parking lot incident was so much more inflammatory than the Mount Laguna incident that the potential spillover effect of the evidence of the former into the relatively weaker evidence of the latter outweighed the interest in trial efficiency.  We are not persuaded.

"Cross-admissibility is the crucial factor affecting prejudice. [Citations.]  If evidence of one crime would be admissible in a separate trial of the other crime, prejudice is usually dispelled." (*People v. Stitely* (2005) 35 Cal.4th 514, 531–532 (*Stitely*).)  To dispel prejudice, "complete (or so-called two-way) cross-admissibility is not required.  In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' " (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221.)  "On a motion for severance, the defendant bears the burden of showing that evidence would not have been cross-admissible in a separate trial." (*People v. Hartsch* (2010) 49 Cal.4th 472, 494.)  As we shall explain, Odish did not sustain that burden.

Evidence of the parking lot incident would have been admissible as to motive in a separate trial on the Mount Laguna incident charges.  Our Supreme Court has "frequently held that evidence of other offenses is cross-admissible to prove motive." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1129; see, e.g., *People v. Armstrong* (2016) 1 Cal.5th 432, 457 [murder and torture of witnesses to impede prosecution of prior murder]; *Stitely, supra*, 35 Cal.4th at p. 532 [murder of victim to prevent reporting of sexual assault as other victim of prior rape had done]; *People v. Arias* (1996) 13 Cal.4th 92, 128–129 [kidnapping and robbery to escape apprehension for prior murder and robberies]; see also *People v. Daly* (1992) 8 Cal.App.4th 47, 55–56

10

[attempted murder of police officers to impede prosecution of prior robberies and kidnapping].)[1] One theory the People urged in opposition to Odish's motion to sever charges was that B.T.'s witnessing of the shooting in the parking lot motivated the kidnapping. Information available at the time of the motion supported that theory. In the factual summary of the motion, Odish stated that S.M. identified B.T. as the woman he picked up and drove to the parking lot where the driver of a pickup truck matching Odish's pulled up and shot S.M.; that 15 days later Odish picked B.T. up at a hotel, drove her to Mount Laguna, and beat and threatened to kill her along the way; and that after B.T. escaped and was taken to a hospital, she told detectives she was scared of Odish and insisted she knew nothing about the shooting in the parking lot. Evidence B.T. witnessed the shooting would be relevant to show Odish's motive and intent as to the kidnapping and other crimes he committed against her in the Mount Laguna incident, namely, to frighten her away from cooperating with law enforcement in any investigation and prosecution related to the parking lot incident. (Cf. *Armstrong*, at p. 457; *Arias*, at pp. 128–129.)

---

[1] "Motive is not a matter whose existence the People must prove or whose nonexistence the defense must establish. [Citation.] Nonetheless, '[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence.' [Citation.] A 'motive is defined as a '[c]ause or reason that moves the will and induces the action[,]' '[a]n inducement, or that which leads or tempts the mind to indulge a criminal act.' [Citation.] Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]." (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017–1018.) "[E]vidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable." (*People v. Roldan* (2005) 35 Cal.4th 646, 707.)

11

Odish contends "[t]he record . . . did not support the People's motive theory" for several reasons. None is convincing.

Odish first cites *People v. Alcala* (1984) 36 Cal.3d 604 for the rule that evidence of a defendant's prior crimes is inadmissible to establish a motive to eliminate the victim of a later crime as a witness and thereby escape increased punishment for the later crime. That rule does not preclude introduction of evidence of the parking lot incident to establish Odish's motive for committing the crimes in the Mount Laguna incident.

In *People v. Alcala, supra*, 36 Cal.3d 604, the Supreme Court considered the admissibility of evidence of prior sex crimes against three minors to establish the defendant's motive to kidnap and kill a fourth minor in the current case. The court rejected the prosecutor's argument the evidence was admissible on the theory the defendant's concern the prior crimes could result in more severe punishment in the current case increased his incentive to eliminate the fourth minor as a witness to her kidnapping. (*Id.* at p. 635.) Were evidence of past offenses admissible on that theory, the court reasoned, "one's criminal past could always be introduced against him when he was accused of premeditated murder in the course of a subsequent offense. . . . The prejudicial effect of the prior-crimes revelations would vastly outweigh their slight and speculative probative value." (*Ibid.*)[2] The court distinguished cases where evidence of prior crimes is admissible because "the

---

[2]     The Supreme Court later explained that in *People v. Alcala, supra*, 36 Cal.3d 604, it was "concerned with the implications of allowing admission of evidence of past crimes for the sole purpose of showing the defendant feared punishment as a repeat offender. [The court] reasoned such a policy would be unfair to repeat offenders because the highly prejudicial nature of prior-crimes evidence would make it difficult for such offenders to receive a fair trial, whereas the probative value of the evidence was slight." (*People v. Rogers* (2006) 39 Cal.4th 826, 864 (*Rogers*), italics omitted.)

12

motive of escape is central, and it can be shown in no other way." (*People v. Alcala, supra*, at p. 635.)

Unlike the evidence of prior crimes at issue in *People v. Alcala, supra*, 36 Cal.3d 604, evidence of the parking lot incident was not offered "for the impermissible and speculative purpose of suggesting [Odish] 'was worried about the implications of his past criminal record.' Rather, it was offered for the specific purpose of showing [he] feared what would happen to him if [B.T.] were allowed to report him," and for that purpose "the evidence was highly probative." (*Rogers, supra*, 39 Cal.4th at p. 864; see *People v. Heishman* (1988) 45 Cal.3d 147, 169 ["evidence of outstanding offenses for which the defendants feared apprehension" was "significantly more probative of motive than in [*People v.*] *Alcala*"].)

Odish next argues evidence of the parking lot incident had no tendency to prove his motive in the Mount Laguna incident, because B.T. denied any knowledge of the parking lot incident when interviewed in the hospital and S.M. could not identify Odish in a photographic lineup when interviewed in the hospital. We disagree. Although S.M. could not pick Odish out of a photographic lineup when he was in the hospital, there was strong circumstantial evidence Odish was the shooter. Odish had a dating relationship with B.T. and suspected her of infidelity. Video surveillance captured a pickup truck matching his truck in the parking lot at the time S.M. was shot. Telephone records showed Odish made calls to B.T. around the time of the shooting and the calls went through a tower near the parking lot. Recorded telephone calls between Odish and Trombly concerned removal of items from his storage unit, and video surveillance at the unit captured Trombly and an unidentified man removing a firearm and ammunition. B.T.'s repeated denials of any knowledge of the shooting during her interview

13

in the hospital do not undermine the theory that the shooting was the motive for the kidnapping and other crimes Odish committed in the Mount Laguna incident. When questioned about the shooting, B.T. repeatedly stated she was afraid of Odish, he wanted her dead, and he would send somebody to kill her if he ended up in jail. A reasonable inference is that B.T. refused to tell detectives anything about the shooting because she feared Odish would kill her if she did. The record sufficiently supported the People's motive theory.

Odish finally argues Evidence Code section 352 would have required exclusion of the evidence of the parking lot incident in a hypothetical separate trial of the charges arising out of the Mount Laguna incident because the prejudicial effect of that evidence substantially outweighed its probative value. We disagree. "In the context of properly joined offenses, we assess potential prejudice not under Evidence Code section 352, but instead in the context of the traditional four factors outlined above: cross-admissibility of charges; tendency of the charges to inflame the jury; the bolstering of a weak case; and the conversion of noncapital charges into a capital case." (*Alcala v. Superior Court, supra*, 43 Cal.4th at p. 1222, fn. 11.) Under the prejudice analysis applicable to severance motions, the cross-admissibility of the evidence of the parking lot incident as the motive for the crimes committed in the Mount Laguna incident "suffices to negate prejudice." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1316.)

In sum, we conclude the evidence of the parking lot incident was admissible to establish motive for the crimes committed in the Mount Laguna incident. Hence, the trial court did not abuse its discretion when it denied the motion to sever the charges for trial.[3]

_____

[3] Our conclusion makes it unnecessary to consider Odish's contentions that the trial court abused its discretion because the evidence of the parking

14

That conclusion, however, does not end the inquiry. "Even when we conclude, as we do here, that the trial court acted well within its discretion in denying severance or consolidating charges, we must further inquire whether events *after* the court's ruling demonstrate that joinder actually resulted in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." (*Merriman, supra*, 60 Cal.4th at p. 46.) The record discloses no such unfairness, for several reasons.

First, the evidence underlying the two incidents was "relatively straightforward and distinct." (*People v. Soper* (2009) 45 Cal.4th 759, 784.) S.M.'s testimony, video surveillance footage, and telephone records constituted the bulk of the evidence concerning the shooting in the parking lot. B.T.'s testimony and statements she made to multiple law enforcement officers constituted the main evidence concerning the Mount Laguna incident. Second, there was no "great disparity in the nature of the two [incidents]—the facts pertaining to each [incident], compared to the other, were not likely to unduly inflame the jury." (*Ibid.*) Both incidents involved assaults on the person, one a shooting and the other a beating during a kidnapping. Third, it is not "clear that the evidence underlying one [incident] was significantly weaker than that underlying the other." (*Ibid.*) According to Odish, "[t]he People's case in both . . . incidents was weak," and "the respective victims presented 'major issues with credibility.'" Fourth, the

---

lot incident was not admissible to establish intent, common plan, or identity as to the Mount Laguna incident, or that the prejudicial spillover effect of the inflammatory evidence of the shooting outweighed the benefits of joinder. "If the evidence of any of the charged offenses would be ' "cross-admissible" ' in hypothetical separate trials of any of the other charges, that is enough '*standing alone*, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses.' " (*People v. Vargas* (2020) 9 Cal.5th 793, 817, italics added.)

trial court instructed the jury: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." (CALCRIM No. 3515.) The jury's inability to reach a verdict on the assault with a firearm charge arising out of the parking lot incident and its ability to reach verdicts finding Odish guilty of the charges arising out of the Mount Laguna incident " 'suggest[ ] that the jury was capable of differentiating [among his] various [crimes]' " and that " 'no improper spillover effect is evident here.' " (*Soper*, at p. 784.) "Considering the proceedings as a whole, we conclude that [Odish's] trial was not grossly unfair." (*Ibid.*)

B.      *Denial of Motion to Admit Impeachment Evidence*

Odish next complains the trial court violated his federal constitutional right to be confronted with the witnesses against him by refusing to allow him to impeach B.T. with her prior convictions. We disagree.

A criminal defendant has a federal constitutional right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.; see *Pointer v. Texas* (1965) 380 U.S. 400, 403 [6th Amend. right to confront adverse witnesses applies to states through 14th Amend.].) "[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." (*Pointer*, at p. 404.) As part of that right, "the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness," and to do so may "introduce evidence of a prior criminal conviction of that witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) "Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.' " (*People v.*

16

*Quartermain* (1997) 16 Cal.4th 600, 623.) A court may limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 (*Van Arsdall*).) A violation of the confrontation clause occurs when a trial court prohibits cross-examination designed "to expose to the jury facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (*Davis*, at p. 318; accord *Van Arsdall*, at p. 680.) "To establish a violation of his right of confrontation, [Odish] must show that the excluded evidence 'would have produced "a significantly different impression of [B.T.'s] credibility." ' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 45 (*Sanchez*).) He has not done so.

B.T.'s credibility was extensively impeached at trial. She appeared in a jail uniform, and on direct examination she testified she had "been in and out of jail recently," was a drug addict, and regularly used fentanyl when she was not in custody. On cross-examination, B.T. admitted she also used methamphetamine. She said she had used no drugs in the past four months because she had been in jail. B.T. testified she lost her nursing license because of an arrest and charges related to fentanyl. She said fentanyl caused her to hallucinate and to make false accusations against her mother, brother, and ex-husband. B.T. said the hallucinations got so bad that she "was starting to kind of lose [her] mind" and "was in and out of the hospital a lot" on psychiatric holds. As to the Mount Laguna incident, B.T. testified she was under the influence of fentanyl during the ride in Odish's truck. She also testified that she did not believe he was trying to kill her during the incident; she told the detectives otherwise because she was "upset," "high," and

17

"hallucinating"; and the statement she gave detectives did not accurately describe what happened.

On this record, the jury reasonably could infer B.T. was incarcerated for drug-related offenses. Impeaching her with the convictions of possession of a controlled substance for sale would have been "repetitive" (*Van Arsdall, supra*, 475 U.S. at p. 679) and "cumulative" (*People v. Price* (1991) 1 Cal.4th 324, 412). And despite Odish's contention to the contrary, introducing those convictions would not have "[d]irectly challeng[ed] B.T.'s veracity" by establishing her " 'readiness to lie' " or "character to lie" and thereby caused the jury to disbelieve her report of the Mount Laguna incident to detectives. Although possession of a controlled substance for sale "involve[s] moral turpitude," "*the trait involved is not dishonesty* but, rather, the intent to corrupt others." (*People v. Castro* (1985) 38 Cal.3d 301, 317, italics added.) In any event, B.T.'s veracity was effectively challenged at trial on both direct and cross-examination. She testified she was hallucinating during the Mount Laguna incident and hallucinations caused her to make false accusations. The inconsistencies between the version of the Mount Laguna incident she told the jury and the one she told the detectives were many and obvious. Although Odish wished to impeach B.T. with her prior convictions, the federal Constitution " 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Van Arsdall*, at p. 679.) Since admission of B.T.'s convictions would not have given the jury "a significantly different impression of [her] credibility," their exclusion did not violates Odish's right to confront the witnesses against him. (*Id.* at p. 680; accord, *Sanchez, supra*, 7 Cal.5th at p. 45.)

Our conclusion there was no confrontation clause violation makes it unnecessary for us to address Odish's related contention such violation was prejudicial and requires reversal of the judgment.  (See *People v. Bharth* (2021) 68 Cal.App.5th 801, 819.)

## IV.

## DISPOSITION

The judgment is affirmed.


IRION, Acting P. J.

WE CONCUR:


BUCHANAN, J.

KELETY, J.

19